PHILETUS SAWYER *et al.*

*v.*

AMBROSE CAMPBELL *et al.*

*Filed at Ottawa October 31, 1889.*

1. BILL TO REMOVE CLOUD UPON TITLE—*parties claiming under a common source—which shall prevail.* If both parties in a bill to quiet title and set aside the assumed title of the defendant, claim from a common source, and the title of the complainant is subsequent and subordinate to that of the defendant, which is held under a valid sale under trust deeds given to the person under whom the respective claims are derived, the bill will fail.

2. EVIDENCE—*as showing under whom one claims title.* A person holding a conveyance of land, accepted a quitclaim deed containing this clause, after the description of the property: "Being the same property described in the deed heretofore made by us to C. W. C., dated * * * This deed is made to clear away certain objections made to said last named deed, or to the abstract thereof, and is made to confirm the title of said grantee claimed under such deed:" *Held,* the grantee in the later deed admitted, by his acceptance of it, that he claimed title under C. W. C., and under a deed made by the grantors to C. W. C., and that such quitclaim deed was procured by the grantee merely in confirmation of such title.

3. SAME—*writings given in evidence generally—effect to be given them —whether party concluded by their contents.* Where a party puts certain

instruments in writing in evidence generally, and not specially for a particular and limited purpose, they will be in evidence to prove any fact material to the issues which they may tend to establish. But by giving them in evidence generally, the party will not be estopped from contradicting any statement contained in them.

4. DEED OF TRUST—*bill to foreclose—whether a waiver of right to sell under power in the deed.* The doctrine that a mortgagee can not, during the pendency of his bill to foreclose, advertise and sell the mortgaged property under the power contained in his mortgage, has no application to a case where a creditor of the mortgagee, during the pendency of a suit against the latter, takes an assignment of the mortgage debt, which he is to collect with reasonable diligence, and is to apply the proceeds of the collection on his claim against the mortgagee.

5. SAME—*bill to set aside sale—prior suit pending, as tending to prevent competition.* A filed a bill against C to establish an equitable lien on certain real estate, which the latter had sold and conveyed to D and E, taking their notes for the price, secured by two trust deeds. After C's death, his heirs and legal representatives, for the purpose of settling the suit, transferred the notes given by D and E, to be collected and applied on A's debt, which was conceded, and it was agreed that A's suit should stand until the collection of these notes. A caused a sale to be made on the trust deeds given by D and E, whereby most of his claim was satisfied. It was claimed by H and S, who also claimed title under C to the property sold, that the sale under the trust deeds, while A's bill was still pending, prevented competition. The property was sold for the amount due on the trust deeds, with the costs and expenses, and H and S's title was subject to such deeds of trust. The sale under the trust deed did not pay the entire demand of A by about $3000: *Held,* that the failure of A to dismiss his bill before the sale under the trust deeds of D and E, afforded no ground for setting aside the sales under the trust deeds, nor did the failure to announce on the day of sale that the proceeds of the sales were to be applied on A's demand.

6. In such case, the payment of the trust deeds of D and E would have worked the release of the land from A's lien, and it was the negligence of H and S, or their willful repudiation of the trust deeds as constituting liens upon their title, after they had in terms assumed to pay them, that prevented them from redeeming their own property, and getting the benefit of the arrangement which the heirs of their covenantor had made for their protection.

7. SAME—*claimant of lien—buying in adverse title.* And pending the bill of A to establish his equitable lien on the land, and before the arrangement by the heirs of C for payment to him, there would be no impropriety in his buying in an adverse title, and seeking to avail of it in furtherance of his efforts to enforce his own lien.

8. Same—*sale under trust deed—as to the mode of payment by the purchaser.* A sale of land under a trust deed for no greater sum than is due on the debt secured, and the costs and expenses, will not be invalidated by the fact that the holder of the debt takes the notes of the purchaser for most of the purchase money secured by his deed of trust. In such case no one is injured by so giving credit to the purchaser.

9. The fact that a purchaser at a trustee's sale of a lot gave his notes for $900 in excess of his bid, for a deed to him by a third person having a claim on the property, whereby a cloud on the title is removed, will not render the sale invalid, or afford ground for avoiding the same.

10. Chancery—*incompetent evidence—presumption that it was not considered.* Where there is sufficient competent and proper evidence in a chancery suit to sustain the decree, the admission of improper evidence will not be material, as it will be presumed that the court, on the final hearing, rejected the same, and decided the case only upon the legal testimony.

11. Same—*amendment of bill after hearing and decision announced.* After the hearing of a bill filed to remove certain deeds of trustees, made under deeds of trust, as clouds upon title, and the decision of the court was announced, complainants asked leave to file an amendment of their bill, offering to redeem from the trust deeds, which was denied: *Held,* that the allowance of the amendment at that stage of the case was a matter resting in the sound discretion of the chancellor.

12. Same—*disclaimer by a defendant—in what way to be disposed of.* A defendant in chancery filed a disclaimer of any interest whatever as to the subject matter of the suit or the result thereof, denying all manner of unlawful combinations, etc. There was also filed a stipulation of the other defendants, releasing him from any and all liability. His answer under oath was waived, and no discovery was sought from him and no relief was asked against him. Upon this, the chancellor dismissed the bill as to him, to which action no objection was made at the time : *Held,* that while the proper practice would have been to have him stand as a defendant until the hearing, the dismissal as to him was not such error as to require a reversal of the decree.

Appeal from the Circuit Court of Cook county; the Hon. M. F. Tuley, Judge, presiding.

Mr. Edward Roby, and Mr. George R. Grant, for the appellants.

Mr. Henry Decker, and Mr. H. F. Vallette, for the appellees.

Mr. JUSTICE BAKER delivered the opinion of the Court:

This was a bill filed in July, 1881, in the Cook circuit court, by Philetus Sawyer and George F. Harding, to quiet the title or remove clouds from the title to lot 2, in the subdivision of the east half of the south-west quarter of section 15, town 38, range 14, in Cook county. Possession of the lot, seizin thereof in fee, and freedom of the premises from incumbrances, were alleged in the bill.

Ambrose Campbell, appellee herein, who was one of the defendants to the bill, claimed that he was the owner in fee of the land, under and by virtue of certain sales made in conformity with the powers given in a trust deed executed in 1868 by Frederick A. Weage, to secure the payment to Charles W. Clayton of purchase money due on that part of said lot 2 lying west of the Vincennes road, and a trust deed executed in 1868 by Hiram Canfield, to secure the payment to Charles W. Clayton of purchase money due on that part of said lot lying east of said road, and in a trust deed on the entire lot, made in 1877 by Francis Canfield to Granville S. Ingraham, in trust, to secure the payment of notes for $18,000 and interest, payable to John McNab.

It is manifest, that if both Campbell, appellee, and Sawyer and Harding, the appellants, claim from said Charles W. Clayton as a common source of title, and the title of appellants is subsequent and subordinate to that derived under the trust deeds, and there have been valid sales and conveyances under said trust deeds, then the contention of appellants is not well grounded, and their bill of complaint was properly dismissed by the circuit court.

It appears from the evidence, that the land records of Cook county were destroyed by fire on or about the 9th day of October, 1871, and that fact, no doubt, is the primary and principal cause of the present controversy, and of the difficulty which has been experienced in arriving at a proper and just

conclusion in respect thereto.  That Campbell derives title from
Clayton, is patent from the evidence.  The parol testimony
of Joel D. Harvey and Frederick A. Weage shows that Clayton
executed and delivered to said Weage a deed of conveyance
for that part of lot 2 lying west of the center of the Vincennes
road, and to Hiram Canfield a conveyance of that part of said
lot lying east of the center of said road.  It is satisfactorily
shown that these original conveyances are not in the posses-
sion or control of appellees, but, on the contrary thereof, it
sufficiently appears that they were destroyed by the same fire
that burned the public record that was made of them.  The
record before us contains a trust deed from said Weage to Joel
D. Harvey, trustee, dated August 26, 1868, and recorded Sep-
tember 3, 1868, in book 475, page 329, in which it is recited
that it was given to secure a part of the purchase money of
that part of lot 2 lying west of the center of the Vincennes
road; and also a trust deed from said Hiram Canfield to said
Joel D. Harvey, trustee, dated October 27, 1868, and recorded
October 31, 1868, in book 490 of deeds, page 112, in which it
is recited it was given to secure a part of the purchase money
of that part of lot 2 that lies east of the center of the old Vin-
cennes road.  It also appears that on December 22, 1876, and
after the death of said Charles W. Clayton, his executors and
heirs transferred and delivered said two deeds of trust, and
the promissory notes secured thereby, duly assigned, to John
McNab.  The evidence further shows, that on the 28th of May,
1877, said Joel D. Harvey, trustee, sold, under said trust deeds,
respectively, said west part and said east part of said lot 2,
and conveyed the same, by trustee's deeds, to Francis Canfield,
and that said Francis Canfield, by his trust deed dated June
5, 1877, conveyed the whole of said lot 2, along with other
property, to Granville S. Ingraham, in trust, to secure the
payment of certain notes described therein; and that after-
wards, on July 27, 1881, said lot 2 was sold by said Ingraham,
trustee, under said trust deed, and struck off to Campbell,

appellee, and conveyed to him by deed from said Ingraham. So the title now held by Campbell is connected with and dependent upon the titles of said Charles W. Clayton.

It appears from the record, that upon the hearing of this cause the decision of this court, "as found in *McNab* v. *Young*, 81 Ill. 11 to 15," was, without objection, considered as read in evidence. In the opinion in that case, as so found, it was, among other things, said: "We place our decision on the following grounds: The title acquired by Parsons at the judicial sale was the legal title. * * * He held the title unchallenged for more than four years, when he sold and conveyed to Clayton. * * * Clayton purchased Heald's interest, paying him $5000 therefor. Parsons, holding the legal title, sold and conveyed it to Clayton."

The title of appellants to lot 2 is derived immediately from Alonzo J. Sawyer. The latter, by deed dated April 23, 1870, conveyed an undivided one-half interest in the premises to appellant Harding, and by deed made in 1876, conveyed the other undivided one-half interest to appellant Philetus Sawyer. The evidence shows that one Benjamin F. Haddock, by his conveyance of April 23, 1870, deeded the lot to said Alonzo J. Sawyer, but that the latter purchased the same for the joint interest of himself and said Harding, and that they went into possession under such conveyance. It further appears from the evidence, that Horatio N. Heald, who, as was decided in *McNab* v. *Young*, as reported in 81 Ill. *supra*, sold his interest in that and other land to Clayton for $5000, quitclaimed, along with his wife, the premises in controversy, on December 20, 1871, to said Alonzo J. Sawyer and Harding, and the quitclaim deed then executed, following the description of the property, contained this language: "Being the same property described in the deed heretofore made by us to Charles W. Clayton, dated October 9, 1867, filed April 2, 1870, and recorded in book 573, page 326, of the records of deeds of Cook county, Illinois. This deed is made to clear away certain objections

made to said last named deed, or to the abstract thereof, and is made to confirm the title of said grantees claimed under said deed."

The fact that Sawyer and Harding accepted this deed from Heald, and had it recorded, is an admission they claimed title under Clayton, and under the deed made by Heald to Clayton, and that this quitclaim deed was procured by them merely in confirmation of such title. The date of the quitclaim deed, and the recitals therein, afford evidence to show that their prior deed from Haddock was in the line of conveyance from and through Clayton. The parol evidence of appellants themselves is, that they "claim to have originally derived title from Clayton," and that they "entered into possession under the deeds from Haddock and from Heald." They introduce in evidence no deeds other than the deeds from Haddock and from Heald. Mr. Harding, in his testimony, said: "I have no recollection of any other title deeds save those produced here. So far as I know, I have produced all that ever were in my possession."

The deed from Haddock to Alonzo J. Sawyer recites: "This deed is made subject to certain incumbrances, which, with interest up to the 1st day of April, 1870, amount to ten thousand four hundred and thirty-four and $\frac{22}{100}$ (10,434.22) dollars, which the party of the second part assumes and agrees to pay." The contention of Campbell is, that this provision in the deed has reference to the incumbrances included in the Weage and Hiram Canfield trust deeds. The contention of appellants is, that it does not so refer, and for the reason that the amounts due upon those two mortgages, calculated to the 1st day of April, 1870, amounted to $10,446.39, instead of $10,434.22. It is also suggested it may refer, at least in part, to the note for $4390.28 given by Sawyer to Haddock for a portion of the purchase money of the premises.

In our opinion, neither of these claims of appellants is well grounded. The $4390.28 was not an incumbrance on the lot

on April 1, 1870, and did not become such until April 23, 1870, and then its payment was secured by a trust deed of that date. It is very improbable that if this latter sum had been secured by the provision in the deed from Haddock, the parties would, on the very same day, have gone to the trouble and expense of further securing it, by giving and taking a double security on the identical property. It would be unreasonable to impute to them so vain and useless a performance. Besides this, the provision in the deed plainly contemplates incumbrances upon which interest had accrued prior to April 1, 1870, and it is absurd to suggest that interest had at that date accrued upon an indebtedness which was not contracted until more than three weeks thereafter. Moreover, the idea of the identity of this $4390.28 with any part of the $10,434.22 is completely rebutted by the terms of the written agreement, made on said 23d day of April, by and between Alonzo J. Sawyer and Harding. That agreement speaks both of the fact that the deed from Haddock "is made subject to certain incumbrances, which, with interest up to the 1st day of April, 1870, amount to $10,434.22, which the party of the 'second part' assumes and agrees to pay," and also of the further fact that the said Sawyer had given to Haddock his note for $4390.28, the remainder of the purchase money, with interest at ten per cent per annum, secured by a mortgage of said lot.

The clause in the Haddock deed evidently refers to recognized and admitted incumbrances upon the lot which were in existence on and prior to April 1, 1870, and upon which interest had accrued to that date. The only such incumbrances shown or suggested by the testimony are the trust deeds to Harvey, made by Weage and Hiram Canfield, respectively. It may be true that an accurate computation of the amounts due upon said trust deeds, down to the date mentioned, will show them to then have aggregated $10,446.39 in place of $10,-434.22, as stated in Haddock's deed. If so, the discrepancy is small,— only $12.17,— and might easily have occurred

through an error or inexactness in computation, or it may be that one or the other of the mortgages, as Haddock, who is now dead, then understood, was entitled to a small credit. At all events, the slight variance that exists, affords no just and reasonable ground for the conclusion that other and different incumbrances were intended, especially as none such are shown to have been in existence.

The logical and rational conclusion from the evidence is, that the title of appellants goes back, through Haddock, to Charles W. Clayton, as the source of title, and was subject and subordinate to the payment to Clayton of the unpaid purchase money due on the lot, which was secured by the two trust deeds to Harvey.

There is much other evidence which strongly corroborates this view of the case. At the hearing, the appellants put in evidence a certain stipulation made in December, 1876, by parties to a cause in chancery then pending in the Superior Court of Cook county, wherein John McNab was complainant and Virginia B. Clayton *et al.* were defendants. A portion of said stipulation was as follows:

"Whereas, the complainant, John McNab, has an acknowledged claim against the estate of Charles W. Clayton, deceased, growing out of transactions between Horatio N. Heald and the complainant, and between the complainant, Horatio N. Heald, John R. Parsons and Charles W. Clayton, which the complainant claims constitutes a lien or charge in equity upon the lands described in his bill of complaint filed in said above entitled cause; and whereas, it is contended on behalf of the defendants above named, claiming as heirs, devisees and legal representatives of the said Charles W. Clayton, deceased, that all the claims of said complainant against the said lands, and all the interest he had therein on January 2, 1868, were contracted to be sold and transferred to the said Charles W. Clayton, under an agreement in writing made and delivered to said Clayton, bearing date January 2, 1868, and referred to in the

said bill, by the said complainant, as a proposition merely, which was never accepted, but if accepted, was afterwards abandoned; and whereas, the parties in interest are desirous of putting an end to this litigation and settling said mortgage claim under said memorandum agreement of January 2, 1868:

"Therefore, the representatives of the said estate of Charles W. Clayton, and also Mary A. Clayton, deceased, and the heirs-at-law interested in both of said estates, have deposited with E. S. Smith, as the attorney and agent of John McNab, the said complainant, and for his use, as collateral security, three certain securities, amounting, in the aggregate, to about $22,-562, as per statements hereto annexed as part of this stipulation,—two of said securities executed by Frederick A. Weage, and the other security by Hiram Canfield. It is understood that the amount of the said mortgage claim of said McNab amounted to, as computed up to January 1, 1877, $25,460, without including any taxes paid on the land.

"It is hereby stipulated that said securities are so deposited as collateral security to enable said complainant to realize the amount of money due thereon as so much payment upon his said claim against said parties in interest depositing said securities, and that reasonable diligence shall be used by said complainant to make the money thereon, and for the purposes of realizing thereon, the said complainant shall have the same rights and authority in the said securities, the same as though he had taken them as absolute payment, with all the rights in said securities expressed.    *    *    *

"It is further stipulated, that for the present, and until the said securities are paid or returned, the said suit shall remain *in statu quo*, without prejudice to the rights of either of the parties, and when said claim of said John McNab shall have been fully paid, then he will execute and deliver to the heirs of said estates full release and satisfaction, under his hand and seal, of all his said claim, under his said security, against said Heald, and all of his said claim under said memorandum dated

January 2, 1868, and quitclaim all rights to the lands under the said mortgage or trust deed so given by said Heald, except taxes paid after the year's tax for 1868."

In the statement annexed to this stipulation is found a full and accurate description of the Weage and Hiram Canfield notes, and the two trust deeds to Harvey securing the same.

The release provided for in the stipulation was also given in evidence. It recites:

"Whereas, Horatio N. Heald and his wife did execute and deliver their trust deed to Henry Moore, dated August 17, 1857, for $15,000, by which conveyance, as a security, certain lots and tracts of land were conveyed, described as follows: (Here follows description of twenty-four lots, embraced in six different blocks, in the subdivision named; also lots 2, 5 and 9, in E. $\frac{1}{2}$, S. W. $\frac{1}{4}$, Sec. 15, etc., lot 2 being the premises in question;) and whereas, said trust deed was made to secure to John McNab said sum of $15,000, with interest, for which said McNab filed a bill in the United States Circuit Court for the N. Dist. of Ill., against said Heald, Moore *et al.*, to foreclose said security, on February 27, 1868, and such proceedings were had that a decree of foreclosure and sale was entered by the court, and said tracts of land were sold by one of the masters of the court, and were deeded by said master to John R. Parsons; and whereas, said Parsons conveyed said lots to Charles W. Clayton, now deceased, after which said McNab filed his bill in the Superior Court of Cook county, in chancery, July 15, 1869, against Hezekiah Young, executor of said Charles W. Clayton *et al.*, to set aside the conveyance from said Parsons to said Clayton, and such proceedings were had that upon the final determination of said cause in the Supreme Court of Illinois said conveyance by the master to said Clayton was upheld, and in the decision of the case by the court it was held that said McNab had an equity existing in his said security. Thereupon said McNab filed his bill of complaint in the Superior Court of Cook county, October 2, 1876, in chancery, to

foreclose his said mortgage lien, against said Horatio N. Heald, Victoria B. Clayton, Lucy C. Dana, heirs-at-law of Charles W. Clayton, Frederick A. Weage, Hiram Canfield *et al.*, and such proceedings were had in said cause, that afterwards the said heirs of said Charles W. and Mary A. Clayton, who claimed an interest in said lands, transferred to the said John McNab certain securities held by them upon certain lots of said several tracts of land for the purpose of satisfying said mortgage debt so in suit of foreclosure; and whereas, afterwards, upon a sale of the land upon said transferred securities, the said mortgage debt was satisfied, except as to certain taxes paid by said John McNab upon the lots and tracts of land during the pendency of the suit so instituted to set aside the conveyance from said Parsons to Clayton, which taxes said McNab claims in his said foreclosure suit, still pending in the said Superior Court, in chancery:   *   *   *

"Now, therefore, this indenture witnesseth, that the said John McNab, in consideration of the premises, do hereby acknowledge full satisfaction of said trust deed security debt set out and stated in his said foreclosure bill, for the said principal and interest, and do hereby forever discharge the same from said lots and tracts of land, reserving and excepting so far as to preserve a lien upon said lots for the taxes paid thereon after the year 1868."

These instruments were put in evidence generally, and not specially offered for a particular and limited purpose. They are in evidence to prove any fact material to the issues which they may tend to establish. We do not hold, however, that because appellants gave them in evidence, they were thereby estopped from contradicting any statements contained in them that they might have seen fit to deny. But inasmuch as such statements have not been contradicted, they are evidence tending to establish that Charles W. Clayton was a common source of title. Moreover, the theory that Clayton was such common source, and that the title of appellants was subsequent and

subordinate to the trust deeds made to secure to him his purchase money for the lot, is consistent with and is corroborated by all the other evidence in the case, and is consistent with and corroborated by the conduct, during many years, of all the parties to this litigation, and that of the parties to numerous former suits, the records of which are here in evidence.

From the proper evidence in the case, we feel fully assured that in respect to the points we have thus far considered the truth of the matter is with appellees.

The notes of Weage and of Hiram Canfield, secured by their respective trust deeds, all of which had been transferred to McNab, not having been paid, Harvey, the trustee, sold the property at public vendue on May 28, 1877, and the same was bid off by Francis Canfield. 'These sales, and the deeds which were thereupon executed by the trustee, compose, in part, the clouds which appellants seek to remove from their title.  At the sales, the land east of the Vincennes road was struck off at $7300, and the land west of that road at $10,300, making $17,600 in all, and being the amounts of the two incumbrances, with costs and expenses.

Some technical objections are urged against the regularity of these sales, which we need not specify, since we find in them no substantial or sufficient grounds to impeach the validity of the proceedings.   The notices of sale were published in a newspaper in Chicago, as was required by the deeds of trust, and the sales seem to have been made in conformity with the provisions of those instruments.

It is claimed that the premises were sold at a sacrifice, caused by the circumstances surrounding the sales, due to the conduct and actions of McNab, the *cestui que trust.*  In *McNab* v. *Young, supra,* this court said :   "That appellant has equities in this matter in controversy we do not question, and, if properly presented, doubtless they will be decreed to him."   That he did, in fact, have an equitable and valid claim against the estate of Charles W. Clayton, deceased, for a considerable sum of money,

which was enforceable on all or a part of the lands involved in the chancery suit then pending in the Superior Court, including the lot here in controversy, is established by the evidence, and by the fact the legal representatives and heirs of Clayton admitted the justice of such claim, and transferred to McNab, in settlement thereof, the notes and trust deeds of Weage and of Hiram Canfield, and subsequently paid him the further sum of $3000. McNab occupied in the chancery suit a position which was adverse to the legal representatives and heirs of Clayton, and to the purchasers from him, including appellants. He had been vainly attempting, for many years, to enforce his equitable lien upon the property; and in the facts that he made the stipulation he did with the representatives of Clayton, and took in part payment of his claim incumbrances which they held on a part of the property, which had been given to Clayton by purchasers from him, and, in accordance with his agreement in said stipulation, used reasonable diligence to make the money thereon, we find nothing so unjust or reprehensible as to call for the interposition of a court of equity. Complaint is made that he did not dismiss his chancery suit, but that, in conformity with the terms of the stipulation, said suit remained *in statu quo* until the securities transferred were paid or returned, without prejudice to the rights of either of the parties. The notes and mortgages covered only a part of his admitted claim, and it would have been unreasonable to require of him to dismiss his chancery suit before the remaining $3000, and the large claims in addition that he held for taxes advanced on the lands, were either paid or secured. It does not appear that it was with any fraudulent intent that the stipulation was not filed in the chancery cause, and there was no occasion for filing it until the conditions of its taking effect were fulfilled. It was for the interest of both Clayton's representatives and of McNab that the property should bring a good price, if sold. Both parties understood that the makers of the notes and trust deeds were insolvent, and that payment

of the same was not intended. McNab had no interest in preventing a redemption of the lot from the trust deeds, by appellants. In fact, it clearly appears that his sole object was to secure and get, at as early a day as practicable, payment of his long delayed moneys.

The circumstance that the proceeds of the sales would go in discharge of McNab's liens was not announced at the sales, but one of the appellants was present and forbid the sales, and he made no inquiry of or statement to either the trustee or McNab, or the latter's solicitor in the chancery suit, all of whom were present, which would have elicited that information. Appellants had expressly agreed to pay these debts, and it was negligence in them if they did not ascertain, either as above indicated or from their grantors and co-defendants, that the proceeds were to be so applied, if that fact was not generally known. The trustee's deeds conveying the lot to Francis Canfield were recorded June 7, 1877, and the formal release executed by McNab, reciting the whole transaction, was recorded June 27, 1877. Appellants remained inactive for more than four years thereafter. By their conduct throughout, and by the bill which they finally filed, they seem to have intrenched themselves behind a shadowy possession, and to have thought that those claiming under the trust deeds could not prove their title, because of the loss and destruction of records and papers.

We think the case of *Coffman* v. *Scoville*, 86 Ill. 300, should not here control, even if we assume that McNab, by taking the trust deeds, stood in the shoes of Clayton. Under the stipulation made, payment by appellants, of the mortgages, would have worked the release of the lots from McNab's lien, and it was their own negligence, or their willful repudiation of the trust deeds as constituting liens upon their title, after they had, in terms, assumed to pay them, that prevented their redeeming their property and getting the benefit of the arrange-

ment which the heirs of their covenantor had made for their protection.

The evidence is insufficient to show that McNab combined with Heacock to have the latter buy up and file the bill to enforce the claim of title made by the heirs of John Beach, for the purpose of clouding the Clayton title, and thereby discouraging appellants from paying off the Weage and Hiram Canfield mortgages. That suit was pending long prior to the time McNab got these mortgages, and could not have had any reference to sales under them. Besides this, the Beach title, was adverse to the title upon which depended McNab's security for the large debt he was seeking to collect in his chancery suit, and it would not have been improper, and perhaps would have been advisable, for him to buy up that title, and seek to avail of it in furtherance of his efforts to enforce his lien for the collection of the indebtedness due him.

The cases of *Hurd* v. *Case*, 32 Ill. 45, *Funk* v. *McReynolds*, 33 id. 496, and *Warrick* v. *Hull*, 102 id. 280, are not in point in the matter of the sales under the powers in the trust deeds to Harvey. The doctrine of those cases is, that a mortgagee can not, during the pendency of his bill to foreclose, advertise and sell the mortgaged property under the power contained in his mortgage. Here, the fact McNab was prosecuting a bill to give effect to an equitable lien that grew out of transactions that transpired in and prior to 1864, would have no tendency to lull appellants to security that no attempt would be made to sell a portion of the same premises under powers in trust deeds made to parties other than McNab, in 1868. In fact, the very object of the transfer of the trust deeds to McNab was, that he should "make the money thereon with reasonable diligence," and there is no place in the facts for the application of the doctrine of waiver.

Nor does the rule announced in the late case of *Ryan* v. *Newcomb*, 125 Ill. 91, control in respect to the sales now in hand. In that case, the sale under the power was made during the

pendency of a bill filed by the maker of the trust deed against the creditor thereby secured, charging usury and payment, and asking for an accounting and for redemption on payment of the sum found due, and it was held that the power of sale was improperly exercised pending the suit to redeem, and that for that reason the sale should be set aside and redemption allowed on the payment of the amount actually due. There, the filing of the bill and the service of process had given the court jurisdiction of the subject matter of the trust deed, and of the parties, and one of the parties to the controversy could not, by assuming to act under the power, oust the court of such jurisdiction. The case would be here in point had there been, at the time of the sales under the trust deeds to Harvey, a bill pending to redeem from the Weage and Hiram Canfield trust deeds; but there was pending no such bill, nor any bill to foreclose said mortgages, nor any other bill involving the subject matter of said trust deeds or the indebtedness secured thereby.

When the sales were made under the two trust deeds, there was a delay of a few days in closing them up and delivering the deeds from the trustee to the purchaser. In lieu of cash, the purchaser, with the consent of McNab, the creditor, finally gave his notes for most of the purchase money, and secured them by a deed of trust on the lot, and on other property in addition thereto. There was no surplus arising from the sales, the entire bids only covering McNab's debts, and therefore no one was injured by the credit which he saw proper to extend to the bidder. *Burr* v. *Borden,* 61 Ill. 389; *Waterman* v. *Spaulding,* 51 id. 425.

It is urged, however, that there was a surplus, since the deed of trust given by Francis Canfield was to secure the principal sum of $18,000, besides interest, and $500 was paid in cash. We think this is sufficiently and satisfactorily explained by the evidence. It appears therefrom that the amount included in the mortgage, which was in excess of the bids, was the consideration paid Heacock for a deed releasing the lot

from the claim of the heirs of Beach, which was a cloud on the title, reaching back of the Clayton title. If the purchaser was content to pay $900 for the deed to him from Heacock, and the consequent removal of this cloud, we are unable to perceive it was any concern of appellants, or did them any injury.

The Francis Canfield trust deed to secure the notes given to McNab was made to Granville S. Ingraham, as trustee. On November 7, 1879, Ambrose Campbell, appellee, bought from McNab said notes and trust deed, paying therefor, in cash, $22,464.83, that being the principal sum of $18,000, and interest, at ten per cent, to the date of the purchase. He also paid McNab about $1200 for that amount of tax liens on the lot taken up by him in protection of said security. In July, 1881, the trustee advertised and sold the lot under the power contained in the trust deed, and the same was struck off to Campbell for $26,000, and conveyed to him. In the view we take of the case, the title to lot 2 is vested in Campbell, and appellants have no just ground for the claim that the conveyances under which he holds should be set aside as clouds upon their title.

There are several questions of minor importance which we will briefly consider:

It is urged the court erroneously admitted in evidence certain tax deeds, without proof of compliance with the constitution and statute in regard to the service of notice on or publication of notice to the owner, occupant and person in whose name the land was taxed. It is also assigned as error, that the court appointed a special master to examine certain *ante-fire* abstract books, relating to transfers of real estate in Cook county, which were in the possession and control of Handy & Co., and report to the court what said abstract books show in relation to the title to the land here in question prior to October 9, 1871, and upon his making a report, ordered it to be filed and received. If these tax deeds, and this report and

abstract furnished by the special master, were incompetent evidence, as is claimed by appellants, then the action of the court, under the circumstances of this case, was of no moment, and furnishes no just cause for reversal. In our view of this record, the other evidence therein fully sustains the decree of the court. If the evidence objected to was incompetent, we must presume the circuit court, on the final hearing, rejected it, and decided the case upon the legal testimony. Were this an action at law, the rulings of the court in admitting evidence would be subject to review. But this being a chancery cause, a different rule prevails, and the inquiry here is, whether or not the competent evidence in the record, taken in connection with the pleadings, sustains the decree that was entered.

In the bill that was filed by appellants, John McNab was made a defendant, and he appeared and filed a disclaimer, in which he fully and absolutely disclaimed "all manner of right, title and interest whatever in and to, and all and all manner of claims or liens upon, the real estate, or any part or parcel thereof, described in said bill of complaint," and denied all and all manner of unlawful combinations and confederacies, etc. There was also a stipulation filed, signed by Campbell and other defendants, releasing said McNab from liability in the action, or on account of any result thereof. Thereupon the court ordered that the bill of complaint stand dismissed as to McNab. The proper practice would have been to have retained McNab as a defendant. We think, however, that under the circumstances of the case, as disclosed by the record, there was no manifest or reversible error in the action of the court in dismissing him out of the case. He had no interest in the subject matter of the suit. The bill waived the oath to his answer, and it would not have been evidence, as an admission or otherwise, against his co-defendants. No discovery was sought by the bill, and he was not called upon to account. No relief of any other character was asked against him. No objection to his dismissal from the suit was interposed, either

at the time the order was made, or during the term, or at any time thereafter.

It is suggested that the bill might have been amended at some subsequent day, and allegations made against him, such as to require his being a party defendant. But no such amendments were made or proposed. The order of dismissal was entered February 18, 1882, and the final hearing was not had until April 8, 1884,—more than two years thereafter. No doubt a suggestion to the court, made during the intervening period, of a desire to have him brought back and retained as a defendant, would have had the effect to restore him as a defendant in the record. But no such move was made, and appellants were apparently content as matters stood. There is nothing in the record to indicate or raise a presumption that McNab is in any way legally liable to respond to appellants, or that if he had remained a defendant it would have been of even the slightest advantage to them, or that they would in that event have pursued a course other than they did. In this state of the case, to reverse the decree solely on account of his dismissal from the cause would be sheer technicality.

After the suit had been heard, and the chancellor had announced his decision, appellants asked leave to file an amendment to their bill, offering to redeem. This privilege the court denied. It was a matter resting in the sound discretion of the court, whether or not an amendment should be allowed at the time the application was made, and we are unable to say that discretion was abused.

We find no substantial error in the record, and the decree is affirmed.

*Decree affirmed.*