The Cape May Real Estate Company owns large acreage at Cape May and was formed to develop the land as a seashore resort. Much of it was platted and laid out in building lots. A hotel was essential to the project, and having charter powers to build one and to own stock in one, the company caused the Cape May Hotel Company to be organized, furnished the land and the money to build the hotel, taking all its capital stock in return. Its directors were the directors of the hotel company. The hotel collapsed in the course of construction. The real estate company having exhausted its funds, a group of its directors, called the "syndicate," *Page 310 
bound themselves to lend to the real estate company $500,000, upon the company giving its three year, six per cent. note to the Colonial Trust Company (Pittsburgh), and as security, its holdings in the local lighting company, the preferred and common stock and $400,000 of bonds of the hotel company secured by a mortgage on the hotel. The trust company acted as trustee for the syndicate, and under the trust agreement, July 10th, 1906, had power to make public sale of the securities in case of default. The real estate company made its note and delivered the securities, the syndicate furnished the $500,000, and the trust company issued participating certificates to the members of the syndicate to the extent of their respective contributions. Two non-directors contributed $25,000 each and received certificates. The cash was paid by the syndicate, upon orders of the real estate company, to the contractors building the hotel, as the work progressed. Neither the hotel company nor the real estate company prospered, and the note was dishonored at maturity. Thereupon the trustee sold the stock of the lighting company at private sale, with the approval of the real estate company, for $125,000. The stock and bonds of the hotel company were sold at public auction, after due publicity, to the syndicate for $100,000. The bid was in self protection. The trust company brought suit for the deficiency on the note and recovered judgment by default in the supreme court for $357,987.59, December 29th, 1910. By assignment, February 9th, 1911, Nelson Z. Graves acquired five-sevenths of the syndicate interest. The estate of John S. Reilley, deceased, and Leopold Volsak each hold one-seventh. The real estate company was declared insolvent in 1920 and a receiver was appointed. He has sold some of the realty holdings of the company free of encumbrances, and the trust company has petitioned for a distribution. Three later day stockholders of the company, and the assignee of a judgment recovered against the company in 1917, answered, and by cross-petition attacked the bona fides of the judgment and sought relief against it, and for an accounting of the securities. After the hearing, under the direction of the court, they filed a plenary bill (it should have been in the name of *Page 311 
the receiver) setting up that the loan was not made to the real estate company, but to the hotel company; that the note and securities of the real estate company pledged as security, wereultra vires the company, and in fraud of stockholders; that the note and pledge of securities of the real estate company were beneficial to the directors in breach of their trust to the stockholders; that the judgment was collusively recovered to defeat a possible judgment in a threatened suit by one Osterling against the real estate company; that the judgment was never regarded as a valid lien by the holders; that it was fraudulently procured by imposition on the law court through withholding from it the information that the note was ultra vires, and the judgment beneficial to the directors in breach of their trust; and lastly, that there was an overcharge for interest in the judgment. The prayer is, that execution of the judgment be restrained; that the judgment be declared satisfied and no lien on the lands of the company, and that it be decreed to be held in trust for the stockholders. An accounting of the securities is one of the prayers.
That the syndicate advanced the $500,000 is beyond question. All the records in the case bear testimony to this. That the sum was loaned to the real estate company to be used by it to finish the hotel of the hotel company, of which it was the sole stockholder, is established by the syndicate contract. The transaction was in utmost good faith. The money was lent to save a bad situation. Directors may lend money to a corporation and secure themselves by pledges of corporate property. Mitchel v.United Box, Board, c., Co., 72 N.J. Eq. 580. The rule that makes voidable a corporate contract with a director, at the instance of a stockholder (Stewart v. Lehigh Valley RailroadCo., 38 N.J. Law 505), does not countenance repudiation by stockholders of corporate debts due directors. The sale by the trust company of the securities was after due publication. No question is raised as to the adequacy of the price of $100,000 at which they were bid in by the syndicate, and no relief is asked on that score. The allegation, in this respect, is, that the securities were never sold; and that is unfounded. The charge that the note and pledged securities were given to secure the *Page 312 
debt of the hotel company and therefore ultra vires, fails, and with it the charge that the judgment was procured by imposition on the law court.
The allegation that suit was brought to forestall one Osterling, architect of the hotel, who had sued the hotel company, and lost (Osterling v. Cape May Hotel Co.,82 N.J. Law 650), and who possibly might sue the real estate company, is without support of evidence and is impertinent. Assuming, however, that to have been the motive for precipitated action by the trustee, and urged by the syndicate, the directors of the real estate company, what injury did the debtor company suffer? Osterling may have had grievance had he recovered; but not the company. It owed the debt.
Quite as irrelevant to the issue is the unsupported charge that the judgment was never regarded by the holders as a valid claim against the real estate company and a lien upon its lands. It should seem sufficient to remind the complainants that the debt remains unpaid, and to point out that when the syndicate sold its five-sevenths interest to Graves the judgment was itemized as an asset. The complainants point to an incident, after Graves acquired the syndicate's interest, as indicating his state of mind that the judgment was valueless. He at that time had become a heavy stockholder of the real estate company and entered upon a scheme to re-organize the company, whose affairs at the time were chaotic. It was to be worked out by chartering a new company to which Graves was to lend $500,000, and involved the surrender of all the outstanding bonds of the real estate company, of which he was also a large holder, in exchange for lots, as provided by the mortgage securing the bonds. All the stock of the real estate company was to be surrendered to the new company in exchange for the latter's stock, to be allocated among the stockholders of the real estate company upon a ratio regarded as equitable. As part of the scheme the judgment was to be canceled. The scheme fell through. It is a far-fetched contention, predicated upon the defunct scheme, that the judgment was treated as worthless and invalid. It altogether overlooks the fact that, for the cancellation of the judgment, Graves was to have compensation *Page 313 
in stock of the proposed company. Something in the nature of an estoppel is set up in favor of the bondholders, who, under the scheme, surrendered bonds for lots on the faith of the cancellation of the judgment. The complainants are suing as stockholders, not bondholders, and whether execution of the judgment upon the lots may be restrained in a suit by those affected is foreign to the present issue. At the hearing Graves expressed his willingness to relieve lot owners of their predicament.
There are other charges of fraud. It is alleged and shown that the security of the stock and bonds of the hotel company, pledged to the syndicate, was strengthened by conveyances to the hotel company of riparian rights and lots for a garage and for a building for hotel help, after the initial pledge was made, and that further security was given for the payment of the $500,000 note after the debt was incurred. None of this, if true, goes to impeach the judgment. The conveyances of land to the hotel company undoubtedly was complemental to a finished institution, according with the understanding previously had between the companies, and found compensation in the stock issue of the hotel company to the real estate company. At least, the contrary does not appear. Nothing of fraud is shown or circumstances from which it may be inferred. However, if these additions added value to the pledged securities it was not manifest when the securities were sold; and the adequacy of the price realized at the sale is not challenged.
The real estate company in 1907 gave a deed for one thousand feet of beach front to one Flynn in trust for the syndicate, as further security. Flynn conveyed to Graves after he purchased the syndicate interest. Graves is entitled to retain the security to make the judgment, or until the debt is satisfied. If the debt is eventually liquidated out of the receiver's assets, the receiver will require a re-conveyance. An accounting for the security at this time would be premature.
It is also charged that the real estate company gave to Flynn and one Keech, as trustees for the syndicate, and as further security, forty-one $1,000 bonds of the company. This security did not pass under, nor is it mentioned in, the *Page 314 
syndicate assignment to Graves, and is not subject to this litigation. The receiver may have an action against Flynn and Keech and the syndicate to recover the bonds if and when the debt is discharged.
The syndicate advanced to the hotel company an additional $5,277, evidently for the construction of a garage or help house on two of the lots conveyed to the hotel company, and received as security a mortgage made to Flynn, for the syndicate. It passed under the syndicate assignment to Graves. It has no bearing on the judgment under attack.
It is apparent that an error of a fractional amount of interest was made in the calculation and for which there is an overcharge in the sum of the judgment. Ordinarily, res adjudicata would be an answer. The receiver, however, being the paymaster, will adjust the error.
The bill, with propriety, could have been dismissed at the outset because of laches. The actions of the board of directors of the real estate company in making the loan, the pledging of the securities, their sale and the recovery of the judgment, were known to the body of stockholders for nearly the past twenty years. They were brought to their attention by the directors at stockholders' meetings upon several occasions. It is too late, after those who were intimate and familiar with the transaction have passed on, to litigate the validity of the judgment. After this long lapse of time, with knowledge, equity will not intervene. Notwithstanding, it was thought expedient to discuss the meritorious questions and clarify the situation to present day stockholders, like the complainants, who have been excited to the belief that they are the victims of fraud practiced upon their forebears, and were artfully instigated to this litigation by a former director and member of the syndicate, himself instrumental in procuring the loan, the pledges and the recovery of the judgment, and who always maintained their integrity until his self-interest was better served by scandalizing them. A large stockholder, he feared to join in the complaint, realizing full well that to do so would lead to his confusion.
The bill will be dismissed. *Page 315