ARN et al. v. OPERATORS ROYALTY &
PRODUCING CO. et al.
No. 816.

District Court, N. D. Oklahoma.
March 3, 1936.

See, also, 4 F.Supp. 370.

F. E. Riddle and O. G. Rollins, both of Tulsa, Okl., for complainants.

Glenn Alcorn, of Tulsa, Okl., W. V. Pryor, of Sapulpa, Okl., and R. W. Reynolds, of Tulsa, Okl., for defendants Dunnett, Cloud, and Disney.

Conner & Winters, of Tulsa, Okl., for First Nat. Bank & Trust Co. of Tulsa, as trustee.

Saul A. Yager, of Tulsa, Okl., and C. C. Madison and Harvey Roney, both of Kansas City, Mo., for Roy S. Randerson and L. B. Randerson.

FRANKLIN E. KENNAMER, District Judge.

Ray M. Dunnett purchased two oil and gas royalty interests under lands in Gray county, Tex., for a total consideration of $22,000, which was paid by notes executed by Dunnett and Disney, Wheeler, Alcorn, and Cloud. This group organized the Operators Royalty Company and transferred the two royalty interests to it in consideration of all of its authorized capital stock of 200,000 shares. The stock was issued and divided among the promoters, who in turn transferred a block of it to Stephen B. Nelson as trustee. The promoters, with Nelson, constituted all of the officers and directors of the corporation and ordered the royalty interests to be set up on the corporation's books at a value of $150,000. It is due the promoters to say that between the time Dunnett bought the royalty interests and the time the interests were set up on the corporation's books, there had been some oil and gas development in the vicinity of the royalties.

The organizers of the royalty company had theretofore managed the Operators Oil Company, which was highly successful. Dunnett and his associates mailed to the stockholders of the oil company the

letter set out in note 1. The offered stock was oversubscribed. The money received from the sale of the stock was in the form of checks payable to the royalty company, but a large part of the money was used by Dunnett and his associates to pay their notes for the purchase price of the two royalty interests and for other purposes of their own. It is interesting to note that only about two weeks elapsed between the time Dunnett purchased one of these royalties and the time the letter was sent to

---

NOTE 1.

Operators Royalty Company,
(Inc)
Atlas Life Building.
May 2nd, 1929.
Tulsa, Okla.
Important Notice

This is to advise you of the organization. of the Operators Royalty Company, incorporated under the laws of the State of Delaware, for 200,000 shares, common, no par value stock. This Company will be officered and managed by the following directors, who are also the managing directors of the Operators Oil Company:

James G. Cloud, President,
John M. Wheeler, Vice-President,
Ray M. Dunnett, Secretary-Treasurer.

The principal business of the Company will be to invest funds in producing royalties, and in royalties under drilling wells and offset drilling wells. However, a certain per cent. of the funds will be spent for cheap royalties where there is geological prospect of opening up new pools, and where there will be a tremendous potential value in case pools do open up.

The entire 200,000 shares of this stock has been issued and, therefore, is fully paid up and non-assessable, and the officers are setting aside a portion of this stock to be sold in small blocks to their associates and friends, this stock to be known as founders' stock. The first block of this to be offered will be offered at $3.50 per share, and will be a block of 12,000 shares. The next block will be a block of 12,000 shares, which will be offered at $5.00 per share, and it is the intention of the directors of the Operators Royalty Company to keep on offering this stock as the Company develops and grows, in reasonable blocks at always an advance in price. For instance the next block may be offered in a block of 20,000 shares at $7.-00 per share.

All money derived from the sale of these shares will be invested in royalties as specified above, possibly sixty per cent. of the money in producing royalties, and forty per cent. in offset or non-producing royalties. The policy of the Company will be to buy royalties on acreage before wells are commenced, and then to sell half of the amount bought after the well is started for enough to clear ¼ or ½ of the royalty, and thereby have a revolving fund that we can constantly keep investing in non-producing royalties ahead of the drill. The Operators Royalty Company has an income at this time of approximately $1000.00 per month, and owns some substantial interests in prospective royalties that we believe will enhance in value many times in the next few months. The $40,-000.00 derived from the sale of the first block of royalty shares will be reinvested, and should add another $1000.00 or $2000.00 per month to our income. (I might add here that we are holding this block of shares for our Chicago stockholders of the Operators Oil Company.) Then the next 12,000 shares to be sold for $5.-00 per share will add $60,000.00 to the treasury, and that money will be invested in royalties, which, of course, will add to our monthly income in the same proportion.

It will be our intention to pay a dividend on these shares at the rate of 1% per month, and we firmly believe that we can maintain this indefinitely no matter what price the shares are selling for. It is the hope of the management of this Operators Royalty Company that we may establish a value of $10.00 per share on these royalty shares within the next eighteen to twenty-four months; therefore, the shares bought at $3.50 now will be three times that much at that time.

The officers of the Company have agreed to waive their rights to dividends for the first year, and have also agreed to donate their intelligence, their time and talent both in the lines of examination of titles, making contracts, purchasing royalties and selling these shares for a period of one year, so that the Company will start off for a year without any salaries or any overhead, and is starting off without any indebtedness, and it will be our intention to keep the Company from any indebtedness other than might be incurred temporarily during the natural course of business for supplies and general overhead after the Company gets on a going basis where the overhead will be required.

It is our belief that you should buy as many of these shares as your funds will permit. This will be the only time that they will be offered at this low figure, and when the 12,500 shares set aside for the Operators stockholders is subscribed, there will be no more at that price. We are not going to allot any certain amount to any certain person, and in case a great many subscriptions reach us we will ap-

the stockholders of the Operators Oil Company soliciting their subscriptions for stock in the royalty company. The net result of the transaction was that the promoters owned free of cost the controlling stock of the royalty company and received in cash enough to pay the purchase price of the property owned by the corporation, all organization expenses, and some profit to themselves in addition. On October 5, 1929, another letter soliciting subscriptions was sent to the group receiving the first letter. The letter of October 5th is set out in note 2. Thereafter the capital stock

portion the shares out in the proportion as they are subscribed for. You may get all the shares you subscribe for or you may get a portion of them. It will be our intention to sell ultimately approximately 100,000 shares, and we hope to realize in the neighborhood of $1,000,000.00 for these 100,000 shares; and it is our belief that operating in conjunction with the Operators Oil Company, and putting in the same talent and knowledge that we have, that we will be able to quickly build up a price on these Operators Royalty shares that will be attractive to the public at $7.50 to $10.00 per share.

Our first purchase of royalty was under the famous Jackson lease, Sec. 88, Block B-2, H & GN Survey, Gray County, Texas. We own 23 royalty acres under this famous lease, and, of course, that is where we know that we will have a steady, substantial income. We also have purchased a part of the royalty in Sec. 58, Block B-2, H & GN Survey, Gray County, Texas. This lease is now being offset by the Phillips Petroleum Company. In addition to this, we have purchased scattered royalty throughout Gray County under approximately 1,000 acres. There are other royalties in the course of investigation and we will keep you posted promptly from time to time as to the growth and income of our new enterprise. Word has just been received from the field that the Magnolia Petroleum Company, offsetting our Jackson Well No. 7, has come in making 700 barrels per hour. Our No. 7 Jackson is right down on top of the sand. We should have some important news in a few days.

Very truly yours,
Operators Royalty Company.

NOTE 2.

Operators Royalty Company,
(Inc.)
Atlas Life Building,
Tulsa, Okla.
October 5th, 1929.

To The Stockholders:

At a Special Meeting of the Board of Directors of the Operators Royalty Company it was decided to borrow $250,000.00 from the Operators Oil Company, giving as security a mortgage on all the holdings of the Operators Royalty Company, and to pay not to exceed 7% interest for the use of the money.

With $250,000.00 cash on hand to invest in royalties, the company believes it can purchase approximately 800 barrels per day of flush production. This added to our present production, would give us an income of approximately $45,000.00 per month or an annual income of better than one-half million dollars. This would give us an established value on our 200,-000 shares of royalty stock of approximately $12.00 to $15.00 per share and an estimated earning power of $3.00 per share per year.

It is the plan of the Directors to liquidate this loan through the sale of Operators Royalty Shares to the present holders or their friends. It is also their desire to see these members get in at a price that will enable them to make some real money out of the Operators Royalty shares as they have out of Operators Oil shares.

Therefore, we are going to offer you the privilege to subscribe now for Operators Royalty shares at Five Dollars ($5.00) per share. This amount will go into the Treasury of the Company and there will be no commission paid to any salesman out of this. The money received from the sale of these shares will be used to liquidate the $250,000.00 loan from Operators Oil Company.

It is our opinion that these shares will be taken very rapidly by the present members at the $5.00 price. All the shares that are not taken by the members at this price will be under-written by a syndicate of Tulsa men so that there will be no question that the loan will be liquidated out of the sale of Operators Royalty Company shares at $5.00 per share. This is your opportunity to participate in additional profits and it will be necessary to have your commitment in our office not later than October 15th.

Payment may be made for these shares one-third on Oct. 31st; one-third on November 30th; and the balance on December 31st. We have called some of our largest stockholders together and discussed this plan and at a meeting held in Chicago on October 2nd, 17,250 shares was subscribed for by eleven stockholders. We would urge you to give this prompt attention as we must have all commitments here in order to make our stock distribution.

Yours truly,
Operators Royalty Company.

was increased and a 50 per cent. stock dividend declared.

The Operators Royalty Company met financial disaster and plaintiffs, who subscribed to stock, pursuant to the letters of May 2d and October 5, 1929, seek cancellation of the promoters' stock, rescission of their own contract of purchase, judgment in their favor for the moneys paid by plaintiffs in purchasing their stock, the appointment of a receiver, and general relief.

At the time Dunnett transferred his royalty interests to the royalty company, the only persons interested in that company were Dunnett and his associates, who had full knowledge of all the details of the transaction. There were no creditors or innocent stockholders.

In Old Dominion Copper Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 636, 52 L.Ed. 1025, promoters formed a corporation that they might sell property to it at a profit and made the sale at a time when they owned all the issued stock. They later caused the corporation to sell other stock to the public. In holding that the corporation could not complain of the transaction, the court said: "At the time of the sale * * * there was no wrong done to anyone," and that the grantors and their syndicate "were on both sides of the bargain, and they might issue to themselves as much stock in their corporation as they liked in exchange for their conveyance of their land." The court also held that a change in stockholders did not increase the corporation's rights, and that if there was a wrong, it was when the innocent public subscribed, but such subscriptions did not confer a right nunc pro tunc upon the corporation. The court said:

"Of course, it is competent for legislators, but not, we think, for judges, except by a quasi legislative declaration, to establish that a corporation shall not be bound by its assent in a transaction of this kind, when the parties contemplate an invitation to the public to come in and join as original subscribers for any portion of the shares."

In Davis v. Las Ovas Co., 227 U.S. 80, 33 S.Ct. 197, 57 L.Ed. 426, a part of the promoters made a secret profit without the knowledge or consent of their associates. The old Dominion Case was held inapplicable and the corporation was permitted to recover.

Whatever may be the rule elsewhere, it seems to be well settled in the courts of the United States that the promoters' fiduciary relation to the corporation does not extend to future stockholders, and if the promoters' profit is known to all of the stockholders existing when the profit is made, it may not be recovered by the corporation. This is clear from the Old Dominion and Davis Cases, supra, and from Ball v. Breed, Elliott & Harrison (C.C.A. 2) 294 F. 227; Ball v. Chapman (C.C.A. 7) 1 F.(2d) 895; South Penn Colleries Co. v. Sproul (C.C.A.3) 52 F.(2d) 557.

In so far as the plaintiffs seek to sue for the corporation, their rights are no greater than its rights and their action must fail unless the corporation could have recovered if it were the party plaintiff. Kessler v. Ensley Land Co. (C.C.A.5) 148 F. 1019; Big Creek Gap Coal & Iron Co. v. American Loan & Trust Co. (C.C.A.6) 127 F. 625; Dickerman v. Northern Trust Co., 176 U.S. 181, 20 S.Ct. 311, 44 L.Ed. 423. The plaintiffs are also met by the rule that they cannot attack a transaction occurring before they became stockholders. Equity Rule 27, 28 U.S.C.A. following section 723; Dimpfell v. Ohio & Mississippi R. Co., 110 U.S. 209, 3 S.Ct. 573, 28 L.Ed. 121; Hawes v. Contra Costa Water Co., 104 U.S. 450, 26 L.Ed. 827; Corbus v. Alaska Treadwell Gold M. Co., 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256.

The plaintiffs urged, however, that they are entitled to recover under the principles announced in McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 50, 80 L.Ed. ——, decided by the Supreme Court of the United States, November 11, 1935, but I do not construe that case as changing the doctrine of the Old Dominion Copper Company Case in a suit brought by stockholders. In the McCandless Case the action was brought by a receiver representing the creditors of the corporation and the opinion deals with the right of the creditors represented by the receiver to set aside the transactions complained of. This is apparent from the entire opinion and from the statement of the court that "the wrong that is here redressed is the unlawful depletion of the assets whereby the company was made insolvent and the creditors were defrauded of their lawful rights and remedies." Even if a receiver were appointed on the plaintiff's bill, he could not maintain the action here. The distinction is clear that a receiver appointed on a stock-

holder's bill holds for the corporation, while one appointed on a creditor's bill holds in hostility to the corporation. Park Lane Dresses, Inc., v. Houghton & Dutton Co. (C.C.A.1) 54 F.(2d) 33; Ft. Dearborn Trust & Savings Bank v. Smalley (C.C.A. 8) 298 F. 45.

■ I therefore hold that the plaintiffs may not, in behalf of the corporation, complain of the transactions by which Dunnett and his associates acquired all of the original stock of the royalty company.

■ There remains the question as to whether the plaintiffs may in this case rescind their stock purchase and recover individual judgments against Dunnett and associates for the purchase price paid by plaintiffs for their stock in the corporation. The bill is prolix and lacks conciseness, but is sufficiently broad to include such relief and counsel's brief definitely claims it. In the Old Dominion Copper Company Case the court carefully limited the scope of its opinion to the precise question decided, and expressly excluded the question as to whether the innocent subscribers had a personal claim against the promoters. Likewise in McCandless v. Furland the question of the right of the creditors to recover damages for deceit was laid to one side. It may be that in a proper action plaintiffs might recover judgment against Dunnett and his associates for false representations and for deceit. But the joinder of a claim for damages to the plaintiffs individually with a claim sought to be prosecuted in behalf of the corporation renders the bill multifarious. The right to sue in behalf of the corporation for wrongs done it is a derivative right in which the corporation is the real plaintiff, but is prevented by the acts of those in control from protecting itself. The right to sue for fraud and deceit practiced upon the plaintiffs in inducing them to purchase their stock is a personal one. The two may not be combined in the same bill. Church v. Citizens' Street Ry. Co. (C.C.Ind.) 78 F. 526; Price v. Union Land Co. (C.C.A.8) 187 F. 886; Monte Rico Min. & Mill. Co. v. Fleming (C.C.A.8) 258 F. 106; Backus v. Brooks (C.C.A.2) 195 F. 452. Compare Jones v. Missouri-Edison Electric Co. (C.C.A.8) 144 F. 765.

The inconsistency of the claims sought to be asserted is apparent. To sue for the corporation, plaintiffs must rely on their status as stockholders. To recover for deceit they wish to rescind their stock purchase, and if that rescission is permitted, they necessarily cease to be stockholders.

In view of this ruling and the fact that there may be some question as to the court's jurisdiction of the individual stockholder's claims, no opinion is expressed on the merits of this branch of the case.

■ There is also involved herein the ownership of a block of stock in the Century Petroleum Company, owned by Operators Royalty Company. The royalty company, being in financial straits, obtained a loan of $12,500 from one Dulaney in Chicago, the stock being pledged as collateral security. Of the amount advanced $5,000 furnished by two of the officers and directors of the corporation on a note executed by them to a third person, so that Dulaney's real interest in the transaction was $7,500 only and the participation in the loan by the officers of the corporation was evidenced by letters between them and Dulaney. It is urged that because of the officers' participation in the loan and the fact that these officers as directors voted in favor of the transaction it is void. Undoubtedly dealings between a corporation and its officers or directors will be closely scrutinized in a court of equity, and if unfair to the corporation or if any undue advantage has been obtained, may be set aside. But that is not this case. Here the corporation was in desperate need of money. Its credit was exhausted and from all the evidence before me, it seems that the officers of the company should be commended rather than condemned for the action they took in an effort to save the company. The pledge was valid. Pierce v. Nat. Bank of Commerce (C.C.A.8) 13 F.(2d) 40; Jackman v. Newbold (C.C.A.8) 28 F.(2d) 107, 62 A.L.R. 729; Carr v. Wainwright (C.C.A.3) 43 F.(2d) 507; Scott v. Norton Hardware Co. (C.C.A.4) 54 F.(2d) 1047. The rule prohibiting an officer from dealing with the corporation does not forbid the officers making a loan to it, nor does it apply where, as here, there is no conflict between the interest of the officer and the corporation. Scully v. Colonial Trust Co., 105 N.J.Eq. 309, 147 A. 776; Dellert v. Stallman (C.C.A.7) 29 F.(2d) 236. It was never intended to permit the enrichment of the corporation at the officers' expense.

■ After the pledge of the stock was made to Dulaney, he advanced further sums to the corporation, taking its note therefor, and complaint is made because on default the stock was sold for the amount

of the original note, plus these advances. The first note signed and under which the pledge was made provided that future advances were to be secured by the same collateral, and the sale was therefore not for an amount exceeding the debt.

When the debt matured, Dulaney began to insist on payment, the officers of the corporation exerted every effort to prevent a sale of the pledged stock, and by correspondence and conferences with the pledgee urged him to delay foreclosure and did succeed in obtaining several extensions of time. They did all that could have been expected of them in attempting to save the company's assets. The pledgee finally advertised the stock for sale, gave notice to all parties in interest, and sold it for the amount of the debt to a representative of J. R. Sharp. After the sale, the purchaser and pledgee agreed that the purchaser would pay the consideration upon the transfer of the stock to him on the books of the corporation, which has not yet been done, largely because of the claims asserted in this case. Between the sale and the present time, there has been a material change in the general condition of the oil industry and a like change in the financial condition of the Century Petroleum Company, so that the stock is now worth several times the price bid for it at the pledgee's sale. At the time of the sale the Century was in receivership, the oil business generally was demoralized, and it appears that every effort was made to obtain bidders. The correspondence shows that the officers of the corporation exerted themselves to the utmost to get some one to take over this stock. In other words, there is nothing to show that the sale was not a fair one. The question is whether or not it has been completed so as to cut off the rights of the pledgor although it should be noted that there has not been any offer to redeem. I think that the principle applicable to the sale of mortgaged property under a power contained in a mortgage is applicable here. In 3 Jones on Mortgages (8th Ed.) it is said:

"The mortgagee may, in making the sale, take all the risk of the credit or for the purchase money upon himself, and charge himself with the whole proceeds, and then pay the surplus in cash to the owner of the equity of redemption or others entitled to it. With this limitation, neither the mortgagor nor other parties interested in the property can object to the giving of credit, for this affords an oppor-

tunity to make a better sale, and is for the benefit of all parties. Although the deed itself provides that the sale shall be made for cash, the mortgagee may give credit for that part of the proceeds coming to him; and if there is no surplus, there is no one who can be injured by any credit which the holder of the mortgage may extend to the bidder."

Furthermore, even if the sale be for cash, the law does not require that it be paid at once, but it may be paid within a reasonable time after the sale. This pledge was made and foreclosed in Illinois and the principles here announced have been affirmed by the courts of that state. See Waterman v. Spaulding, 51 Ill. 425; Burr v. Borden, 61 Ill. 389; Strother v. Law, 54 Ill. 413; Sawyer v. Campbell, 130 Ill. 186, 22 N.E. 458. And see Holliday v. McGraw, 106 Misc. 661, 176 N.Y.S. 661, and Marlin v. Sawyer (Tenn.Ch.App.) 57 S.W. 416.

Another issue may be shortly disposed of. Roy Randerson, et al., interveners who sold to the Operators Royalty Company the stock of the Century Petroleum Company, ask to rescind the sale. I find generally all the issues against this claim. In any event, they are not entitled to recover the stock as against the purchaser at the pledgee's sale.

Let a decree be submitted in accordance with the views herein expressed.