## Datillo, et al. v. Roaten Creek Oil Company, et al.

(Decided December 16, 1927.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

1. Corporations.—Finding by chancellor that one of defendants in action seeking to hold them liable to corporation for secret profits, alleged to have been made out of transactions with company, was not a director, promoter, or officer thereof, but interested only as to private agreement between him and one of officers, held sustained by evidence.

2. Corporations.—A promoter occupies toward corporation he is promoting fiduciary relationship and owes to such corporation and all future stockholders duty to protect them not only from all others, but, in addition, from his own cupidity.

3. Corporations.—Promoter of corporation occupying fiduciary relationship to corporation and stockholders held liable to corporation for secret profits secured by him in transaction with corporation at time it was absolutely under control of directors chosen by him and who were scheming with him to exploit corporation.

ALLEN P. DODD for appellants.

DELOZIER MOXLEY for appellee McAndrew.

W. PRATT DALE for appellee Bulleit.

Opinion of the Court by Turner, Commissioner— Affirming.

Prior to the 13th of February, 1919, W. E. McAndrew and E. D. Noe were the owners of about 1,000 acres of oil and gas leases in Todd county. On that day McAndrew entered into a contract with Reed & Slate, of Allen county, whereby the two latter sold to McAndrew numerous designated oil leases on 2,288 acres of land in Allen county. In the contract McAndrew agreed to organize an oil company, and to provide by sale of the stock of such company a development fund for the purpose of operating and exploiting both the Allen and Todd county leases, and such other leases as the corporation might acquire. The consideration to be paid by McAndrew to Reed & Slate for the Allen county leases was fixed at $42,500 of the par value of the stock in the $300,000 corporation he undertook to organize; and it was a part of the contract that the leases were to be deposited at a bank

in Scottsville in escrow, together with a copy of the contract, and to be delivered upon the deposit of the stock.

It is apparent throughout the record that the Todd county leases were regarded as of only nominal value, and that they had cost McAndrew and Noe very little; on the contrary, the Allen county leases were considered as of some potential value, doubtless from the fact that prior to that time some producing oil wells had been drilled in that county.

On the 19th day of February, McAndrew was in Louisville and went to see Mr. V. J. Bulleit, the president of a bank, and who had theretofore become interested in other oil companies. The result of that conversation was that Bulleit and McAndrew entered into an agreement by which Bulleit was to have 30 days in which to investigate the properties, their title, etc., to determine whether he would take over the proposition and undertake to organize a corporation and finance the venture; Bulleit at the time saying that he was compelled on the 22d of February to go to Oklahoma on an extended trip and desired the 30 days for that reason. Then on the 20th of February, before Bulleit left the city, McAndrew had a proposition from George G. Montz and others whereby they would pay him $25,000 in cash for the leases and $85,000 in stock of a $300,000 corporation they proposed to organize.

McAndrew, deeming this a more attractive proposition than that of Bulleit, sought to obtain from the latter a release from the 30-day option, and it was agreed between him and Bulleit that for such release he would pay Bulleit $5,000 in cash and give him 10,000 shares of the stock in the proposed corporation.

The proposal then between Montz and his associates and McAndrew was closed, but so modified as to provide for a $400,000 corporation instead of the $300,000 one, and as a part of this modification it was agreed that McAndrew should have a proportionate increase of stock in the $400,000 corporation, and that his vendors, Reed & Slate, should likewise have a proportionate increase in the stock they were to receive for their Allen county leases.

Immediately after the proposal of Montz and his associates was accepted by McAndrew, they proceeded to take steps to organize the corporation, and accordingly on March 4, 1919, the Roaten Creek Oil Company was

organized in South Dakota, the incorporators merely being figureheads who had no real interest in the matter. Then on that same day there was a meeting of the stockholders at which these figurehead incorporators were elected directors and Ed Noe president; and on the same day there was a meeting of the directors at which all the dummy directors resigned, and then Noe, as president, appointed Montz, Kammerer, Stocker, and Butterweck as directors. These directors then elected Montz as secretary and treasurer, and designated McAndrew as the field agent to direct the drilling operations.

At the meeting of the directors McAndrew assigned the Allen and Todd county leases to the corporation according to the previous agreement, and there were then issued five shares of stock each to the directors to qualify them, and the remaining 399,975 shares of stock were issued to McAndrew, and he immediately transferred 100,000 shares of that stock back to the company, which, according to the agreement, was to be sold at 50 cents a share to provide a fund for the payment of the $25,000 to McAndrew, and the remainder to be used as a development fund. Afterwards all of the remaining shares so issued to McAndrew, except 114,168 shares, were returned to the company in one way or another; and out of that number of shares McAndrew, according to his agreement with Reed & Slate, assigned to them for the leases about 57,000 shares.

Immediately thereafter the 100,000 shares were placed upon the market at 50 cents a share, and in due time the company realized from the sale of that and some other of its stock something over $51,000, out of which $25,000 was paid to McAndrew. He then paid Noe $10,000, retained $10,000, and paid Bulleit $5,000 in cash, in addition to the $10,000 in stock he had agreed to give him to release the option.

After it had become apparent that the Allen county leases were practically of no value, all of the interested parties agreed to purchase another lease, known as the Graves' lease, in the name of the company, and raised a fund among themselves of $12,000 for that purpose by a sale of the company's stock. That lease also turned out unfavorably, and when the inside of these transactions became known these four plaintiffs, the owners of stock bought from the company, brought this action against the company, Noe, McAndrew, Kammerer, Stoecker, But-

terweck, Bulleit, and Montz, seeking to hold them liable to the company for the secret profits alleged to have been made by them out of their dealings and transactions with the company, and out of the sale to and manipulation of the company's property. It is alleged that McAndrew and Bulleit were the promoters of this corporation, and as such had sold the leases to the company, and so manipulated its affairs as to make profits for themselves out of the company's property, and in selling their own property to the company at excessive prices.

The issues were made up, Bulleit, in adition to a denial, claiming that he had no interest in the company or part in its management, except he had contracted as recited above with McAndrew to waive his option on the leases, and thereby only incidentally became interested in the proposed corporation.

While the action was pending the oil company was thrown into bankruptcy, and the trustee in bankruptcy filed a pleading in this action joining in the prayer of the plaintiffs.

Upon submission, the court entered a judgment for the use and benefit of the company against Noe and McAndrew for the $20,000 received by them from the sale of the company's stock, and for $4,000 in addition growing out of the purchase of the Graves' lease. The action was dismissed as to Bulleit upon the theory that the evidence did not show that he had ever been a director or a promoter of the oil company involved. This is an appeal by the plaintiffs from so much of the judgment as dismissed the action against Bulleit, and McAndrew prosecutes a cross-appeal seeking to reverse the judgment against him, none of the other parties appealing from the judgment entered.

· So far as the original appeal is concerned, the question is wholly one of fact. It is alleged by the plaintiffs and the company that Bulleit was one of the promoters, and that he and McAndrew promoted the corporation, and he together with McAndrew brought about the sale of McAndrew's leases to the corporation which they had organized, and which they at the time controlled, at an exorbitant price, and that, they being promoters and occupying toward the corporation and its future shareholders a fiduciary relationship, equity and fair dealing will not permit them to profit by such a sale to the cor-

poration which they promoted and which they at the time controlled. On the contrary, Bulleit's defense is that he was never an officer of nor did he participate in the promotion of the corporation which was organized and took over the McAndrew leases. The evidence tends to show, and it was so found by the commissioner and the chancellor below, that McAndrew did approach Bulleit before he took up the matter with Montz and his associates; that even prior to that McAndrew had taken steps to organize a corporation to take over these leases, but that Bulleit told him he would have nothing to do with his proposed corporation, but if he had time to investigate the leases, their locality, and the title he might himself buy the leases and put them into a corporation which he himself would organize, and, if necesasry, would finance; that then he and McAndrew entered into an agreement by which Bulleit was given a 30-day option on the McAndrew leases in view of his contemplated extended trip to Oklahoma; that thereafter and before he left, McAndrew was attracted by the proposition from Montz and his associates, and entered into an agreement with Bulleit, by which the latter waived his 30-day option in consideration of his promise to pay him $5,000 and give him 10,000 shares in the corporation which Montz proposed to organize. It is Bulleit's contention from this situation that he neither was an officer of nor a promoter of the Roaten Creek Oil Company, and it really appears to have been organized and all the preliminary steps taken, and many of the 100,000 shares sold, before he returned to Kentucky from his Oklahoma trip. It is apparent that he took some interest in the affairs of the Roaten Creek Oil Company, but this is easily explained by the fact that he was incidentally interested in its success because of the ownership of 10,000 shares of stock.

It is likewise apparent that McAndrew caused certain parties to believe that Bulleit not only was interested in the company, but would probably be a director in it, and as a matter of fact there was issued in Bulleit's name, during his absence, 5 shares of stock to qualify him as a director; but upon his return he promptly turned back the certificate and informed the officers of the corporation that he would not be a director in it.

Obviously, if Bulleit was neither a director nor a promoter of the corporation, and had nothing to do with its organization and the manipulation of its affairs, but was

incidentally interested because of his agreement with McAndrew, there should be no recovery from him for secret profits obtained. His contract with McAndrew had naught to do with either the promotion of the organization or management of the company; it was only a private agreement between him and McAndrew to enable the latter to carry out the proposal of Montz and his associates. The evidence that this was the true and only relationship of Bulleit to the Roaten Creek Oil Company is satisfactory, and we approve the finding of the chancellor below on this branch of the case.

On the other hand, it is true beyond peradventure that McAndrew was the real promoter of this corporation. He owned and controlled the leases which he made the basis of its organization, and which were, in truth, its only assets. The evidence tends to show that he contracted for this sale to the corporation at a very excessive valuation; that at the time this sale was completed he and those associated with him absolutely controlled the corporation, and had among themselves agreements by which they were to be its chief beneficiaries. They, in effect, under this situation sold these leases to a corporation owned and controlled by themselves at what the evidence shows to be an excessive price. They so manipulated the affairs of this corporation as to make its future stockholders, who bought stock from the company, furnish the funds not only to carry out McAndrew's contract with Bulleit, but to furnish the money for development purposes.

A promoter occupies toward the corporation he is promoting a fiduciary relationship; he owes to that corporation and to all of its future stockholders the duty to protect them not only from all others, but, in addition, from his own cupidity. Equity will not tolerate such unconscionable dealing by him with the corporation which he has promoted, and for the time controls, as to affect the rights of future stockholders who buy their stock from the company in ignorance of the unfair manipulation and fraud that he has theretofore perpetrated, which of necessity affects the value of the stock they buy.

Obviously, the subsequent buyers of stock from the company in this case knew nothing of the previous manipulations by which McAndrew, the promoter, had sold to the corporation which he promoted, and which he at the

time controlled, these leases at an unconscionably high and excessive price.

The same rules of conscience and equity apply to the transactions involved in the purchase of the Graves' lease. It is disclosed that the company paid Graves $12,000 for the lease, and that money was raised by the sale of its stock, but it is further disclosed that at the time of its sale to the company McAndrew had control of that lease, or had an option upon it, and persuaded his associates, who were the directors of the corporation, to agree to pay $20,000 for that lease, and that he and Noe, the president of the company, divided that $8,000 profit. So this promotor of the corporation which was absolutely at the time under the control of directors chosen by him, and who were in a scheme with him to exploit the corporation, sold to the corporation a lease which he knew could be purchased for $12,000 for the sum of $20,000 by agreeing to divide the profit of $8,000 with the president of the corporation.

Occupying, as he did, the fiduciary relationship to this corporation and its stockholders, such transactions cannot in equity and in good conscience be approved, and such secret profits will not be tolerated under such conditions. Thompson on Corporations (Cumulative Supplement 1922, secs. 103, 104); Old Dominion Copper Co. v. Bigelow, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314; Paducah L. C. I. Co. v. Mulholland, 15 Ky. Law Rep. 24; 14 C. J. 293, 294; 7 R. C. L. 70, 71.

This is not an action, as was Taylor v. Citizens' Oil Co., 182 Ky. 350, 206 S. W. 644, to cancel stock issued by the company in payment of leases in excess of the reasonable market value thereof; on the contrary, it is an action by the bankrupt corporation and certain stockholders to recover from the officers and promoters of the corporation secret profits which they fraudulently realized in the sale of their own property for excessive prices to the corporation at a time when they controlled it.

The chancellor's judgment on both branches of the case is in accord with these views, and it is affirmed.