PHOEBE W. JEFFS, FLORA MEYERHOFFER SEARS,

GRACE S. MCMILLEN, OLIVIA NIELSON AND NOLA RUNDQUIST

*vs.*

UTAH POWER & LIGHT COMPANY, AND ELECTRIC

POWER AND LIGHT CORPORATION.

Kennebec.    Opinion, April 26, 1940.

*Locke, Campbell & Reid,*
*Pattangall, Goodspeed & Williamson,*
*Critchlow & Critchlow,*
*Joel Nibley,*
*Putney, Twombley & Hall,* for plaintiffs.
*George R. Corey,*
*McLean, Fogg & Southard,*
*Simpson, Thacher & Bartlett,*
*Perkins & Weeks,* for defendants.

SITTING: BARNES, C. J., STURGIS, THAXTER, MANSER, JJ.

THAXTER, J.   This is a bill in equity brought by five preferred stockholders of the Utah Power & Light Company, a Maine corporation, for an accounting by the Electric Power & Light Corporation, another Maine corporation, of certain alleged secret promoters' profits claimed to be held by the Electric Power & Light Corporation which it had received in part from its predecessor in title, the Utah Securities Corporation, a Virginia corporation, one of the original promoters in the organization of the Utah Power & Light Company, and in part in direct payments. Other relief such as cancellation of the common stock of Utah Power & Light Company, claimed to have been issued without consideration, or the payment for it is asked for. The plaintiffs bring the bill on behalf of themselves and of any stockholders who may wish to join and on behalf of the defendant, the Utah Power & Light Company.

The defendants demurred both generally and specially. These demurrers were sustained and a decree was entered dismissing the bill as to both defendants with costs. From such decree the plaintiffs have appealed.

The transactions set forth in the bill are exceedingly complex. They concern the dealings of five corporations with each other, only two of which are parties to the bill. Large amounts of money and property were passed from one to another for no apparent reason as disclosed by the bill. The plaintiffs claim that it all has been in pursuance of a scheme formulated almost thirty years ago whereby the Electric Bond & Share Company of New York and its associates would acquire electric utility properties in Utah, Idaho, and Colorado and by means of pretended sales would cause title to these properties to become vested in an operating company, Utah Power & Light Company, one of the defendants in this case, at greatly inflated prices without disclosing to such company or to its prospective stockholders the cost of such properties or the fact of such inflation, and thereby fraudulently and unlawfully would obtain for the syndicate and its associates large secret profits, and also would retain the control and management of such operating company for the syndicate and those associated with it to the detriment of the operating company and its stockholders. Such in brief is the plaintiffs' claim.

We are concerned, however, with what actually happened and

with the effect of the various manipulations on the rights of these plaintiffs. It is accordingly necessary to analyze the allegations of the bill with some care.

The Electric Bond & Share Company, a New York corporation, is said to be in the business of promoting, financing, managing and controlling utility corporations. September 6, 1912, it caused the defendant, Utah Power & Light Company, to be organized as a corporation under the laws of Maine. The corporation started with nominal stock which two months later was increased to $40,000,000.00 consisting of 400,000 shares of the par value of $100.00 each. The certificate of incorporation was later amended to authorize the issuance of other classes of stock which from time to time was sold to the investing public as directed by the Electric Bond & Share Company. At the same time the Electric Bond & Share Company caused the Utah Power Company to be organized as a corporation under the laws of Maine with an authorized issue of 60,000 shares of stock of the par value of $100.00 of which 50,000 shares were common stock and 10,000 shares were preferred. The directors and officers of this corporation it controlled. At about the same time it caused to be organized under the laws of Virginia a third corporation, Utah Securities Corporation, which was the predecessor of the defendant, The Electric Power & Light Corporation, which to all intents and purposes stands in its shoes. The authorized capital of this corporation was $30,000,000.00, represented by 300,000 shares. Controlling all of these corporations Electric Bond & Share Company proceeded to pass property through the Utah Power Company and the Utah Securities Corporation until title finally reposed in its other ward the Utah Power & Light Company which was the operating unit.

The first transaction took place September 25, 1912, when it is alleged Utah Power Company purchased from an agent of Electric Bond & Share Company by which it was then controlled certain utility properties and securities which had been acquired by Electric Bond & Share Company at a cost to it of not exceeding $2,975,091.35, and paid therefor $8,500,000.00, in notes of the Utah Power Company in the amount of $2,500,000.00, in preferred stock of the par value of $1,000,000.00, and in common stock of the par value of $5,000,000.00. September 26, 1912, Utah Securities

Corporation at the direction of Electric Bond & Share Company traded 274,990 shares of its capital stock having a par value of $27,499,000.00 for the 50,000 shares of stock of the Utah Power Company and also took the $2,500,000.00 notes and the $1,000,000.00 preferred stock, and certain other securities which had been acquired by Electric Bond & Share Company at a cost to it of not exceeding $1,800,947.47 and paid therefor $4,500,000.00 in cash. November 1, 1912, Utah Securities Corporation at the direction of Electric Bond & Share Company purchased securities from Electric Bond & Share Company which had cost the latter $1,962,365.36, and paid therefor $1,962,365.36 in cash and in 25,000 shares of capital stock of Utah Securities Corporation of a par value of $2,500,000.00.

At this stage in the promotional scheme it appears from the above that Utah Securities Corporation was the owner of property and securities which had cost Electric Bond & Share Company $6,738,397.18 and that for these it had paid in cash $6,462,365.36 and in 299,990 shares of its own capital stock of a par value of $29,999,000.00.

At this point on December 12, 1912, as alleged in the bill Utah Power & Light Company enters the scene and was caused by the promoting companies to purchase these properties and securities held by Utah Securities Corporation which had cost it $6,738,397.18, together with certain other securities which had cost $4,158,111.00 and to pay therefor as follows:

$9,500,000.00 in 6% three year notes,

$3,500,000.00 in par value second preferred stock,

$20,000,000.00 in par value common stock.

January 25, 1913, at the instigation of the promoters Utah Power & Light Company bought from Utah Securities Corporation properties and securities which had cost the latter $2,152,832.33, and paid therefor in 78,370 shares of its common stock of a par value of $7,837,000.00. During the month of February, 1913, at the direction of the promoting companies Utah Securities Corporation surrendered to Utah Power & Light Company $4,500,000.00 of the latter's 6% notes which it held and 28,370 shares of common stock, and in exchange therefor received 30,000 shares of 7% preferred

stock of Utah Power & Light Company of the par value of $3,000,000.00 and 43,370 shares of its 6% second preferred stock of the par value of $4,337,000.00.

Following through these transactions we now find that the Utah Power & Light Company had properties which had cost the promoters $13,049,340.51 and it had outstanding against these the following securities:

> $5,000,000.00 6% three year notes,
> $3,000,000.00 7% preferred stock,
> $7,837,000.00 6% second preferred stock,
> $25,000,000.00 common stock.

Two years later in February, 1915, in pursuance of the scheme of promotion the following transaction took place as set forth in the bill. Utah Securities Corporation transferred properties which had cost it $1,097,400.00 to Utah Power & Light Company and cancelled an indebtedness of Utah Power & Light Company of $416,001.68. Utah Power & Light Company in turn issued its notes to Utah Securities Corporation in the amount of $242,314.19, cancelled an indebtedness of Utah Securities Corporation of $900,000.00 and issued to the latter 50,000 shares of common stock.

Carrying through all of these transactions we now find the following situation as set forth in the plaintiffs' bill and admitted by the defendants' demurrer:

Property and securities received by Utah Power & Light Company at their cost to the promoters $14,146,740.51

Payments for the above had been made as follows:

| | |
|---|---|
| 6% three year notes | $5,000,000.00 |
| Other notes | 242,314.19 |
| Net amount of indebtedness after inter-company cancellations | 483,998.32 |
| TOTAL | $5,726,312.51 |

| | |
|---|---|
| 7% preferred stock par value | 3,000,000.00 |
| 2nd preferred stock par value | 7,837,000.00 |
| Common stock par value | 30,000,000.00 |

Two years after this while the balance sheet so far as the bill shows remained as above the Utah Power & Light Company began to sell its preferred stock to the public.

The bill alleges that at this time the promoters had garnered large amounts of secret profits. But we must not lose sight of the fact that the promoters were on both sides of the transactions, and were the only ones interested. It was as if A, B and C, owning property worth let us say $100,000.00 had formed a corporation and transferred that property to it in return for 5,000 shares of capital stock of an aggregate par value of $500,000.00. They were both sellers and buyers and acted with a full knowledge of all the facts. How could anyone claim that at this point any fraud was committed? And where is there any profit? In the place of property worth $100,000.00 the promoters had shares of stock worth $100,000.00. One can not defraud himself, nor does one make a profit merely by changing his ownership from a tangible to an intangible form. The most which can be said is that in the case before us the bill by inference at least implies that there is something sinister in the circuity of these transactions, in their deviousness, and in their complexity. But nothing yet has happened. It is as if the stage were being set for a drama which has not yet commenced. The intended victim of all these machinations has not yet appeared. This is the story as set forth by the bill when in 1917 preferred stock was offered to the public by the operating company. In considering the rights of these new stockholders we must not lose sight of the fact that the company was the owner of property which had cost the promoters over $14,000,000.00 and had outstanding securities senior to the preferred stock to be offered to the public or on an equality with it of $8,726,312.51.

Before considering the other allegations wherein it is claimed the promoters received secret and unlawful profits let us consider the situation to this point; for the gravamen of the plaintiffs' complaint seems to be based on the transactions enumerated above.

The plaintiffs base their right to recover on the case of *Mason* v.

*Carrothers,* 105 Me., 392, 74 A., 1030. This case was decided more than thirty years ago at a time when the courts both in this country and in England were seeking to find some solution for a problem, then presented by isolated cases, which had not at that time so touched the public conscience that preventive measures had been adopted through legislation. Because judicial remedies could only be invoked after the harm had been done and because there were so many procedural difficulties in the way, the net result of what the courts have accomplished has been disappointing. Nowhere is there better proof of the adage that an ounce of prevention is worth a pound of cure.

When we consider the history of this subject we shall see how distinct are the facts set forth in this bill from those presented in the classic cases on which the plaintiffs rely. Reduced to its simplest terms the problem presented by these cases is this. Promoters A, B and C, owning property let us say worth $100,000.00 transfer it to a corporation and receive in exchange stock of a par value of $500,000.00. Stock is then sold by the company to the public for cash at $100.00 per share, in an amount of $500,000.00. It is obvious that a gross fraud has been perpetrated on the outside stockholders, for they have put $500,000.00 into the company, the promoters have put in $100,000.00, and yet the promoters share equally with the outsiders in the assets.

In England more than sixty years ago the House of Lords laid down the general principle that promoters who form a corporation and sell to it property which they themselves own are in a fiduciary position to the company and must make a full disclosure to an independent board of directors of all material facts if the sale is to stand. *New Sombrero Phosphate Company* v. *Erlanger,* 5 Ch. D. 73, Aff'd 3 App. Cas. 1218 (1878) ; *In re Olympia, Ltd.* (1898), 2 Ch. 153, Aff'd (1900), App. Cas. 240 ; Sub. Nom. *Gluckstein* v. *Barnes.* In this latter case the company was permitted to recover a secret profit made by the promoters at its expense. In disposing of the contention that a disclosure had been made Lord MacNaughten in his opinion in the House of Lords said: " 'Disclosure' is not the most appropriate word to use when a person who plays many parts announces to himself in one character what he has done and is doing in another. To talk of disclosure to the thing called the company,

when as yet there were no stockholders, is a mere farce. To the intended shareholders there was no disclosure at all. On them was practiced an elaborate system of deception."

Following the principle enunciated in these cases the Massachusetts court laid down the doctrine that promoters of a corporation who issue to themselves a part of the capital stock in payment for services at an excessive valuation, are guilty of a fraud when the facts are not disclosed to those who are invited to subscribe for stock. Such promoters it was held are liable to account in equity in a suit brought by the corporation. *Hayward* v. *Leeson*, 176 Mass., 310, 57 N. E., 656. Though recovery was permitted through the medium of the corporation, the Court recognized, page 320, 57 N. E., 661, that the fiduciary relationship was in fact with "the persons who put their money into the enterprise at the invitation of the promoters, that is to say, the future stockholders."

A few years later came the *Old Dominion Copper Company* cases. The question arose first on a demurrer to the bill which was overruled on the authority of *Hayward* v. *Leeson*, supra. *Old Dominion Copper Mining & Smelting Company* v. *Bigelow*, 188 Mass., 315, 74 N. E., 653. The bill was then heard on the merits and sustained. This ruling was affirmed. *Old Dominion Copper Mining & Smelting Company* v. *Bigelow*, 203 Mass., 159, 89 N. E., 193. Two promoters, Bigelow and Lewisohn, owners of certain mining properties, organized a corporation under the laws of New Jersey. While owning all of the original shares subscribed for and in complete control of the corporation, they caused it to issue to them shares of a par value of $3,250,000.00 in payment for property which had cost them $1,000,000.00, the market value of which was then a little less than $2,000,000.00. It was the intention to sell at par to the public shares of a par value of $500,000.00 to provide working capital. Within a very short time thereafter substantially all of this remaining stock was sold to the public without disclosure of the contract between the company and the promoters, under which they obtained their stock. The defendant Bigelow was held liable to account to the corporation for the secret profit received by the promoters.

At about the same time a similar suit was started in the United States Circuit Court for the Southern District of New York. A demurrer to the bill was sustained and this ruling was affirmed by the

Circuit Court of Appeals. On certiorari this ruling was unanimously affirmed by the Supreme Court. *Old Dominion Copper Mining & Smelting Company* v. *Lewisohn*, 210 U. S., 206, 28 S. Ct., 634. We thus have a situation where the Supreme Judicial Court of Massachusetts and the United States Supreme Court reached a diametrically opposite result on exactly the same state of facts. The Supreme Court opinion written by Justice Holmes holds that the corporation, which was the plaintiff, had, before any stock had been sold to the public, assented to the transaction complained of; that at that time no wrong had been done to anyone; that if the corporation had no right to recover at that time, it got no new right by reason of the fact that the public subsequently became stockholders. The opinion points out an injustice which may follow from the application of the Massachusetts doctrine. The corporation may recover the profit received by all from any one of the promoters. This promoter may own a relatively small number of shares. As no contribution can be enforced from the others he pays the whole amount; and the others, if still remaining stockholders, get the benefit. That this result was possible was recognized both by the English courts and by the Massachusetts court but was not held a bar to recovery. *New Sombrero Phosphate Company* v. *Erlanger*, supra, L. R. 5, Ch. D. 73, 114. Jessel, M. R. said: "But the doctrine of this Court has never been to hold its hand and avoid doing justice in favour of the innocent, because it cannot apportion the punishment fully amongst the guilty." See also *Old Dominion Copper Mining & Smelting Company* v. *Bigelow*, supra, 203 Mass., 159, 192, 89 N. E., 193.

The Supreme Court case has been followed by some courts. *Hughes* v. *Cadena de Cobre Mining Co.*, 13 Ariz., 52, 108 P., 231; *Lilylands Canal Co.* v. *Wood*, 56 Colo., 130, 136 P., 1026; *Lake Mabel Development Corp.* v. *Bird*, 99 Fla., 253, 126 So., 356; *Hoffman Motor Truck Co.* v. *Erickson*, 124 Minn., 279, 144 N. W., 952; *Continental Securities Co.* v. *Belmont*, 154 N. Y. S., 54, Aff'd 222 N. Y., 673, 119 N. E., 1036; *Blum* v. *Whitney*, 185 N. Y., 232, 77 N. E., 1159; *Metcalfe* v. *Mental Science Ind. Ass'n*, 127 Wash., 50, 220 P., 1. See also *Henderson* v. *Plymouth Oil Co.*, 16 Del. Chan. 347, 141 A., 197.

The doctrine of the *Lewisohn* case has, however, been very much

qualified. See *McCandless* v. *Furland*, 296 U. S., 140, 56 S. Ct., 41. The dissenting opinion in this case holds that the decision is in conflict with the *Lewisohn* case. But see *Arn* v. *Dunnett*, 93 F. (2d), 634, Cert. Den'd, 304 U. S., 577, 58 S. Ct., 1046.

Outside of the Federal courts the weight of authority supports the Massachusetts rule. *Beal* v. *Smith*, 46 Cal. App., 271, 189 P., 341; *Parker* v. *Boyle*, 178 Ind., 560, 99 N. E., 986; *Datillo* v. *Roaten Creek Oil Co.*, 222 Ky., 378, 300 S. W., 854; *American Forging and Socket Co.* v. *Wiley*, 206 Mich., 664, 173 N. W., 515; *Allenhurst Park Estates, Inc.* v. *Smith*, 101 N. J. Eq., 581, 138 A., 709; *Nebraska Mausoleum Co.* v. *Matters*, 108 Neb., 618, 188 N. W., 231; *Torrey* v. *Toledo Portland Cement Co.*, 158 Mich., 348, 122 N. W., 614; *Rugger* v. *Mt. Hood Electric Co.*, 143 Ore., 193, 20 P., 2d, 412; 21 P., 2d, 1100; *Pietsch* v. *Milbrath*, 123 Wis., 647, 101 N. W., 388, 102 N. W., 342; *Bennett* v. *Havelock Electric Light & Power Co.*, 20 Ont. L. Rep., 120; *Gluckstein* v. *Barnes*, supra; *Wills* v. *Nehalem Coal Co.*, 52 Ore., 70, 96 P., 528; See also *Roberson* v. *Draney*, 53 Utah, 263, 178 P., 35; *Downey* v. *Byrd*, 171 Ga., 532, 156 S. E., 259, 72 A. L. R., 345.

Comments on this general subject will be found in 22 Harv. L. Rev. 48, 45 Yale L. J., 511; also in an article by Arthur W. Machen, 24 Harv. L. Rev. 347, 356 *et seq.* A full discussion will be found in an article by A. A. Berle, Jr. in 42 Harv. L. Rev. 748. In 30 Harv. L. Rev. 39, R. D. Weston, who was the master appointed in the matter of two petitions for review in the *Bigelow* case, discusses some of the practical problems which arise under the doctrine of that case.

These problems are very real and have caused courts to qualify the rule in important respects — qualifications which in some instances relate to substance and in others to the remedy. Some of these have a direct bearing on the present case.

In the first place it is made clear in the *Bigelow* case that, though the promoters stand in the relation of trustees to the corporation and the technical wrong is to the corporation which brings the suit, the real injury is done to those stockholders who are asked to put cash into the enterprise as a part of the promotional plan for the purpose of starting the corporation on its course. Those who come in later may, however, stand on an entirely different basis. We must

recognize that property put into a new venture may, by its combination with other units or by the efficient use which is made of it, attain a value which by itself it did not have. Furthermore the profits which a business earns may be used for expansion or left to accumulate over the years; and what started as an uncertain, feeble venture may ripen into a stable, prosperous, going concern in which the public is glad to invest irrespective of the manner of its organization. The wrong to the future shareholders is in the invitation to them by the promoters to come in under the expectation that assets and profits will be shared proportionately by those who assume the same proportionate share of the risk. A bill in equity such as that now before us should therefore show that the new stockholders either came in contemporaneously with the promoters or at such a time or under such circumstances that they are entitled to be treated as if they had. The Massachusetts court has made it very clear that future stockholders coming in at a remote time may be in an entirely different position from those who came in during the promotional stage. For that court said, *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, supra, 203 Mass., at page 191, 89 N. E., at page 207, in discussing the case of *Salomon* v. *Salomon* (1897), App. Cas., 22, where a part of the authorized capital at the time of organization was not issued: "It was to be issued or not in the remote future, as the exigencies of the corporation in the actual conduct of its business might require, but, in any event, it was not to be issued for the purpose of starting the corporation on its course. This circumstance materially affects the question here to be considered."

There is a further limitation on the right of the corporation to recover secret profits. If the promoters are the original subscribers to the entire capital stock contemplated to be issued and these promoters sell their shares to innocent outside parties without disclosing the secret profits, there is no fraud on the corporation and there can be no recovery under the doctrine of the *Bigelow* case. *Hays* v. *The Georgian, Inc.*, 280 Mass., 10, 181 N. E., 765, 85 A. L. R., 1251. To the one who has been defrauded it would seem to make little difference whether he has received his stock directly from the corporation or from the hands of the promoters. But having in the *Bigelow* case, 188 Mass., 315, 325, 74 N. E., 653, based

the right to recover on the theory that there had been no acquiescence in the promoters' scheme by the future stockholders who bought from the corporation, the Court could see no escape from the conclusion of the *Georgian* case where the assent of all the stockholders appeared to have been given. A dictum in *Mason* v. *Carrothers*, 105 Me., 392, 399 (see also discussion on page 406), 74 A., 1030, supports the principle of the *Georgian* case, which has been generally followed in this country. The law unquestionably is that the corporation can not for the benefit of its shareholders recover promoters' secret profits if all of the capital stock passed through the hands of the promoters to the public. *The Mile Wide Copper Co.* v. *Piper*, 29 Ariz., 129, 239 P., 799; *Turner* v. *Markham*, 155 Cal., 562, 102 P., 272; *Lake Mabel Development Corp.* v. *Bird*, supra; *Tompkins* v. *Sperry, Jones & Co.*, 96 Md., 560, 54 A., 254; *Brooker* v. *Wm. H. Thompson Trust Co.*, 254 Mo., 125, 162 S. W., 187; *Piggly Wiggly Delaware* v. *Bartlett*, 97 N. J. Eq., 469, 129 A., 413; *Blum* v. *Whitney*, supra; *Hamilton* v. *Hamilton Mammoth Mines, Inc.*, 110 Ore., 546, 223 P., 926; 18 C. J. S., 553-554.

Bearing in mind these general principles let us consider the law in this jurisdiction and its applicability to the facts of the case now before us.

Our Court has adopted the English doctrine that promoters stand in a fiduciary relation to the corporation which they bring into being. *Camden Land Co.* v. *Lewis*, 101 Me., 78, 63 A., 523; *Mason* v. *Carrothers*, supra. In *Mason* v. *Carrothers* the Court undoubtedly adopted the doctrine of *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, supra, 203 Mass., 159, 89 N. E., 193, although the suit was brought directly by the shareholders claiming to have been injured instead of by the corporation as in the Massachusetts case. As counsel in the instant case claim that the facts set forth in the plaintiffs' bill are substantially the same as in the case of *Mason* v. *Carrothers*, an analysis of that case is necessary.

The bill in *Mason* v. *Carrothers* was brought by eleven preferred stockholders of the Marine Safety Appliance Company, against the company and other stockholders who were its promoters to secure the cancellation of certain shares of stock claimed to have been illegally issued. Two of the defendants, Barcus and Hallam, agreed to form a corporation with a capital of $1,000,000.00 divided into

$200,000.00 of six per cent cumulative preferred stock and $800,000.00 common stock. Irvine and Lihou, the owners of certain patent rights agreed to transfer these to the corporation in return for $100,000.00 of preferred stock and $50,000.00 of common stock and certain cash payments and an agreement for royalties. The corporation was formed November 13, 1905. Instead of the patent rights being transferred directly to the corporation, they were assigned to Barcus and Hallam on November 17, who in turn assigned them to the corporation and took in payment $100,000.00 of the preferred stock and $799,400.00 of the common stock, being all of the common stock authorized except the shares standing in the names of the temporary incorporators. Barcus and Hallam then assigned $100,000.00 of the preferred stock and $50,000.00 of the common stock to Irvine and Lihou, and either directly or through the corporation secured to them the balance of the payment for the patent rights. They also transferred back to the corporation $200,000.00 par value of the common stock. These dealings resulted in the following situation. Irvine and Lihou had been paid in accordance with their agreement. In addition to their royalty agreements and $10,000.00 in cash and notes they had $100,000.00 preferred stock and $50,000.00 in common stock of the corporation; Barcus and Hallam had $549,400.00 of the common stock which appears to have cost them nothing except the time and labor which they had put into organization work; and there was $100,000.00 of preferred stock unissued and $200,000.00 of common in the corporate treasury. Barcus and Hallam appear to have later assigned their stock to the defendant, Carrothers, who took it with full knowledge of these transactions. Within three months after the organization of the corporation the plaintiffs purchased stock from the corporation, receiving for each $100.00 paid in one share of preferred stock and two shares of common.

The real problem in this scheme of promotion is to determine the status of the common stock and particularly that part which went to the preferred stockholders who brought the bill in equity joining the promoters and the corporation as defendants. For the court held that the stock issued to Barcus and Hallam was wrongfully issued in breach of a fiduciary duty and that a master should be appointed to determine the rights of all parties.

It may be argued that this case is an authority for the proposition that any preferred stockholder may maintain a bill in equity to secure the cancellation of common stock wrongfully issued. This contention may be founded on the theory that the plaintiffs in so far as they were holders of common stock which had passed through the hands of Barcus and Hallam were bound under the authority of *Hays* v. *The Georgian, Inc.*, supra, by the assent of Barcus and Hallam to the issuance of the stock and hence that their only right to bring the action arose out of their holdings of preferred stock. It is evident, however, that the real transaction was the issuance of $549,400.00 in common stock to Barcus and Hallam and the retention by the corporation of $200,000.00 as unissued. Just why it was all issued to them and $200,000.00 turned back is not apparent nor is it important ; for we are concerned with the substance of the transaction, not with its form. Such has been the view of a number of courts in treating analogous situations. *California-Calaveras Mining Co.* v. *Walls*, 170 Cal., 285, 300-301, 149 P., 595 ; *Datillo* v. *Roaten Creek Oil Co.*, supra ; *American Forging & Socket Co.* v. *Wiley*, supra ; *Torrey* v. *Toledo Portland Cement Co.*, supra ; *Anderson* v. *Johnson*, 45 R. I., 17, 119 A., 642.

The theory of *Mason* v. *Carrothers*, supra, is that the plaintiffs, having paid value for common stock, were injured by reason of the fact that other similar stock had been issued to others without consideration. To be sure the common stock was called bonus stock, but the essence of the transaction was that the plaintiffs paid on the basis of $100.00 for one share of preferred stock and two shares of common. In principle the case is identical with *Old Dominion Mining & Smelting Co.* v. *Bigelow*, supra, 203 Mass., 159, 89 N. E., 193, although the remedy differs in form. The case is not an authority for the proposition that a preferred stockholder as such has an unqualified right to maintain an action for the cancellation of common stock issued without consideration. It must be evident that promoters make no secret profit merely by the issuance without consideration of common stock to themselves. Their profit comes when that stock is either resold to outsiders, or outsiders, paying a consideration for unissued stock, participate with the promoters in the enterprise.

Coming now to the proposition before us, it is evident that in a number of respects the plaintiffs do not bring their case within the principles laid down by the cases which follow the Massachusetts rule. There is no definite allegation in the bill as to the actual value of the property turned over by the promoters. We are told merely the price which the promoters paid for it. For the purpose of this opinion, however, we shall assume that this represented its value.

Furthermore it is not clear from the bill that the stock which the plaintiffs own may not, while in the hands of prior owners, have assented to the acts of which the plaintiffs now complain. Under these circumstances, if we follow the doctrine of *Hays* v. *The Georgian, Inc.*, supra, the plaintiffs would be estopped to assert their present claims. But let us leave that suggestion aside, for there are other more important considerations.

The acts complained of which we are now considering started in 1912 and the last transaction involving the alleged wrongful issuance of stock was in February, 1915. Phoebe Jeffs, one of the plaintiffs, purchased from Utah Power & Light Company in September and October, 1922, more than six years and a half after the last of the issues of stock complained of, three shares of preferred stock at $96.00 per share plus accrued dividends. The plaintiff, Flora Sears, purchased three shares for the same price and under similar circumstances in July and August of that year. The plaintiff, Olivia Nielson, purchased two hundred and eighty shares of preferred stock at various times during and subsequent to the year 1927; but it does not appear that any of this stock was bought from the company. The other two plaintiffs own ten and five shares respectively; but the bill does not allege when or under what circumstances they bought them. The bill does state that none of the plaintiffs had any knowledge until just before the bringing of the suit of any of the unlawful or fraudulent acts complained of.

It can be readily seen that this presents an entirely different picture from what we see in the Massachusetts cases, in *Mason* v. *Carrothers*, supra, and in fact in all the other instances where the bills have been sustained. In each of them the transfer of shares to the promoters and the sale to the plaintiffs have been a part of one transaction. They have been contemporaneous. In more than six years much water can be squeezed out of stock, and, in the absence

of allegations to the contrary, we may assume that the corporate balance sheet during such a period may have materially changed. It is evident that the plaintiffs did not purchase their stock during the promotional stage. To adopt the language of the Massachusetts court in *Old Dominion Mining & Smelting Co.* v. *Bigelow*, supra, 203 Mass., 159, 89 N. E., 193, their stock was not issued "for the purpose of starting the corporation on its course."

But there is another more fundamental reason why the plaintiffs can not prevail. They are preferred stockholders and do not hold both preferred and common stock as was the case in *Mason* v. *Carrothers*, supra. Under the facts set forth in the bill it is impossible to see how they have been damaged by the acts complained of. At the time when preferred stock was offered to the public there was outstanding $5,726,312.51 indebtedness of the corporation and it had issued preferred stock of a par value of $3,000,000.00. Against this it had property which the bill concedes cost the promoters $14,146,740.51. There was therefore an equity represented by junior securities of $5,420,428.11. What did it matter to the plaintiffs whether that equity was represented by one share, or by three hundred and ten thousand, or by more than that? There might possibly have been an effect on voting control but the bill does not allege concealment from the plaintiffs of the amount of stock outstanding, but only of the want of consideration received for it. As a matter of fact if junior stock was issued, if for any consideration at all, the plaintiffs were benefited rather than harmed; for the protection back of their own investment was increased by the value of such property irrespective of the amount of securities issued against it.

There is nothing in this bill to show that the shares of stock issued to these promoters in any way impaired the security of the plaintiffs' stock or any preference to which it was entitled. The preferred stockholders so far as the bill indicates had no interest in the share of the corporate assets of those holding securities junior to theirs, nor in the earnings which might accrue over and above the amount necessary to satisfy the dividends on the preferred stock. The preferred stockholder was given no bonus of common stock as in the case of *Mason* v. *Carrothers*, supra. A plaintiff, who can show no injury to himself by reason of the facts of which he complains, surely has no standing in court. For a discussion of the rights of

preferred stockholders in this situation see an article by A. A. Berle, Jr., 42 Harv. L. Rev. 748, 759-762.

Two cases throw further light on this subject.

*Rugger* v. *Mt. Hood Electric Co.*, supra, was a suit by preferred stockholders to enjoin the payments of alleged claims of officers and directors of a corporation which were held to constitute unlawful, secret profits. In holding that the action could be maintained under the principle of *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, supra, 203 Mass., 159, 89 N. E., 193, the opinion was careful to point out that the rights of the preferred stockholders were based on a provision of the articles of incorporation providing that twenty-five per cent of the annual net profits after the payment of a seven per cent dividend on the preferred stock and a like amount on the common should be set aside as a reserve fund to be used to retire the preferred stock. The preferred stockholders, therefore, had a direct interest in the amount of the common stock issued.

In *Roberson* v. *Draney*, supra, the court in a dictum, 53 Utah, page 272, 178 P., 35, follows the Massachusetts doctrine but holds that a plaintiff to be entitled to relief under it must show either an injury to his property rights by reason of the acts complained of, or that the corporation has suffered a tangible wrong. He must be acting not as an interloper but in good faith.

Another case cited by the plaintiffs is very significant. *Barrett* v. *Webster Lumber Co.*, 275 Mass., 302, 175 N. E., 765. This was a bill by a preferred stockholder seeking to restrain one of the defendants from enforcing payment of certain notes of the corporation which he had received in payment for common stock of the corporation which the corporation had bought from him. One of the grounds for dismissing the bill was that at the time of such purchase there were ample assets to pay the corporate debts and the entire outstanding preferred stock, and that therefore a preferred stockholder had no cause to complain. The only ones who could possibly have been injured were the common stockholders and they had assented to the transaction.

The plaintiffs do suggest in their brief that they have suffered an injury in that the cushion of protection behind their investment was not what it was represented to be. They do not claim any direct misrepresentation. But they suggest that they had a right to assume

that the 300,000 shares of common stock and the 78,370 of second preferred represented $37,837,000.00 of assets. Assuming it all to be true they nowhere allege that their stock is worth any less than they paid for it. But beyond this counsel cite no case holding that a preferred stockholder has any absolute right to compel common stockholders to pay in full for the common stock issued to them, nor is any such case not based on a statute likely to be found. The two cases cited do not sustain such a proposition. In *Scully* v. *Automobile Finance Co.*, 11 Del., Ch. 355, 101 A., 908, the common stock was issued in violation of the statutes and constitution of Delaware, and from the opinion it also appears that the complainants received with their purchase of preferred stock a bonus of common. In *Howard* v. *National Telephone Co.*, 182 Fed., 215, the stock was issued in violation of a statute.

A suit to recover promoters' secret profits rests on a different basis from the ordinary stockholders' derivative suit. It is founded on the theory that there is a fraud on the stockholders who subsequently come in to share in the promotional scheme, and that because of such fraud they are permitted to sue either by using the corporate name as in *Old Dominion Mining & Smelting Co.* v. *Bigelow*, or in their own names, joining the corporation as a party defendant as in *Mason* v. *Carrothers*. That this right is formulated on the theory that a wrong has been done to the corporation by the promoters who stand in a fiduciary relationship to it, must not obscure from us the fact that the real basis of the action is the wrong done to the future innocent shareholders, who will find it difficult to obtain effective redress if left to their individual actions against the promoters. To assume, as the plaintiffs apparently have in this case, that under the doctrine of *Mason* v. *Carrothers*, there is the right on the part of a stockholder in a corporation to sue promoters for supposed secret profits, irrespective of the injury done to such stockholder, is to confound the remedy which the courts have adopted in these cases with the wrong itself.

The plaintiffs have shown no actionable wrong done to themselves by reason of the issuance of the securities to the promoters, nor in fact any such wrong done to the corporation which is the foundation for a derivative suit. Two other charges in the bill need to be considered.

The bill alleges that in the years from 1917 to 1925 the promoters caused the defendant, Utah Power & Light Company, to sell its preferred stock to the public and that the promoters received commissions for obtaining purchasers of from seven to ten per cent on the price of the stock sold, totaling in all $831,200.00. These commissions the bill holds were not earned, and were not disclosed to the public or to the Utah Power & Light Company, and constituted unlawful, secret profits.

The payment of excessive commissions to brokers and to others in the underwriting and sale of corporate securities has been a wrong which recent legislation has sought to correct. But taking the allegations of this bill most favorably to the plaintiffs, it is hard to see how they can be the basis for the relief asked for here. It is true as the defendants urge that the allegations are set forth in general terms and probably do not give us the whole story. Furthermore they seem to suggest rather an aggravation of the more fundamental charges against the promoters. So far as the bill shows these payments may have been charged against accumulated earnings which belonged to the common stockholder, the Electric Power & Light Corporation, the real defendant here. See *Bates Street Shirt Company* v. *Waite*, 130 Me., 352, 362, 156 A., 293, which holds that the payment of excessive salaries out of earnings, if the preferred stock dividend is not impaired, is not a just cause for complaint on the part of a preferred stockholder. In any event the implication of the bill is that the payments were made from assets which belonged to that stockholder and that no injury resulted to the preferred stockholders.

Likewise the complaint that dividends were paid to Electric Power & Light Corporation on the common stock during the years 1925 to 1932 inclusive is without merit. It seems to be based on the theory as alleged in the bill that because the stock itself represented an unlawful and secret profit no dividend could be paid on it. What has been said heretofore in this opinion disposes of this contention. In passing, however, we might remark that the bill does not allege that such dividends were not paid out of earnings or that the payment in any way impaired the safety of the preferred stock covenants.

In view of what has been already said, it seems unnecessary to con-

sider further the allegations of the bill, or to comment on the other arguments of defendants' counsel.

*Appeal dismissed.*
*Decree dismissing the bill with costs affirmed.*