**SAN JUAN URANIUM CORPORA-TION, Appellant,**

v.

**Thomas G. WOLFE and Virginia E. Wolfe, Appellees.**

**No. 5429.**

United States Court of Appeals Tenth Circuit.

Jan. 2, 1957.

Rehearing Denied March 14, 1957.

Thomas S. Williams, for appellant.

A. Francis Porta, El Reno, Okl., and Mather M. Eakes, Oklahoma City, Okl., for appellees.

Before PHILLIPS, MURRAH and LEWIS, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment of the District Court dismissing appellant's complaint for failure to state a claim upon which relief can be granted.

The complaint, as amended, alleged in substance and effect that the appellee, Thomas G. Wolfe and one Deardorf caused the appellant corporation to be organized for the purpose of exploring for and mining uranium and associated minerals; that after organization of the company and the installation of dummy officers and directors, the corporation represented to prospective purchasers of its stock that certain mining claims, its only asset, had been acquired from William M. Smallwood and his wife for a cash consideration of $25,000, evidenced by a note payable in six months, and certain stock; that out of the proceeds of the sale of the stock, the corporation issued its check to Smallwood in the sum of $25,000; that the check was delivered to appellee, Wolfe; Smallwoods' endorsement was forged thereon; Wolfe endorsed it, cashed it, and loaned the proceeds to his partner, Deardorf, who invested it in a home to which Wolfe now holds the legal title.

It is alleged that the mining leases purportedly sold to the corporation by Smallwood for $25,000 were in fact owned by Rollie B. Walter, who acquired them from their owners without money consideration and transferred them to Smallwood, who in turn transferred them to the corporation for the $25,000 note; that this transaction was in furtherance of a scheme and device between Deardorf, Smallwood and Wolfe to fraudulently extract money and stock from the plaintiff. The prayer was for judgment against the defendants, Wolfe and Smallwood, and a lien against the real property in which the money had been invested.

Under the allegations of the complaint, which must be taken as true, there can be no doubt of the scheme on the part of the promoters of the corporation to defraud it of the $25,000. The only question is whether the corporation has standing to complain of the fraud.

The trial court gave no reasons for its dismissal, but the judgment is defended here on the theory that while, as promoters of the corporation, Wolfe and his associates stood in a fiducial relation to it, they were under no duty to account to the corporation for the $25,000 since all of the parties interested in the corporation at the time of the transaction had full knowledge of it and could not therefore complain.

This theory does indeed find venerable support in Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 636, 52 L.Ed. 1025. In that case, Mr. Justice Holmes, speaking for a unanimous court, held that a corporation had no right of action against its promoters whose entire stock was issued to them at the time of incorporation, although the corporation later issued additional stock and disposed of it to stockholders who were ignorant of fictitious profits to the promoters. This is so, said Mr. Justice Holmes, because at the time of the transaction, the promoters "were on both sides of the bargain, and they might issue to themselves as much stock in their corporation as they liked in exchange for their conveyance of their land."

Contemporaneously with this litigation, another suit involving the same transactions reached the Supreme Court of Massachusetts. In the face of the Holmes decision, that Court reached a diametrically opposite conclusion, saying, "A review of the authorities seems to demonstrate that there is a liability of the promoter to the corporation when further original subscribers to capital stock contemplated as an essential part of the scheme of promotion came in after the transaction complained of, even though that transaction is known to all the then stockholders, that is to say, to the promoters and their representatives." Old Dominion Copper Mining & Smelting Co. v. Bigelow, 203 Mass. 159, 89 N.E. 193, 202, 40 L.R.A.,N.S., 314, affirmed 225 U.S. 111, 32 S.Ct. 641, 56 L. Ed. 1009.

The contrariety of views expressed in the two cases has been the subject of much comment. See Annotation, 85 A. L.R. 1262; Vol. 1, Fletcher Cyc.Corp., Perm.Ed., § 194, p. 627; § 196, p. 641;

see also Cumm.Supp. §§ 194-5-6; XLV Yale L.J. No. 3, Jan. 1936, p. 511. The Lewisohn case was qualified or explained by a closely divided court in McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121, the dissenters taking the view that it was repudiated.

█ The weight of authority supports the Massachusetts rule. See Jeffs v. Utah Power & Light Co., 136 Me. 454, 12 A.2d 592. And, while Oklahoma has not taken sides, it has embraced the universally accepted view that the promoters of a corporation occupy a fiducial relationship to it which requires them to make full disclosure to their immediate associates in the promotional enterprise. See Jarvis v. Great Bend Oil Co., 66 Okl. 179, 168 P. 450. In Arn v. Dunnett, 10 Cir., 93 F.2d 634, 637, we held, following the Lewisohn case, that while the promoters of a corporation occupied a trust relationship to it, a profit to them from the sale of property to the corporation for stock was not secret or unlawful where the stockholders of the corporation, having a present interest in the corporation and the transaction, knew and gave assent to the sale. "The effect of the transaction" said the court "was that the corporation acquired and became owner of the property free of obligation, and the promoters owned the stock; * * * there were no other stockholders; there was no secrecy; * * * The corporation was not injured through fraud, secrecy, or otherwise; * * *."

█ Not so in our case. The stockholders who became interested in the corporation subsequent to the transaction complained of were original stockholders. Their investments paid the $25,000 for which it is alleged none of the faithless promoters gave any value whatsoever. Here, unlike the Arn case, the deceptive representations were made to prospective stockholders to induce them to purchase stock, the proceeds of which were to be paid to the promoters in furtherance of a fictitious scheme. This,

we think, constituted a flagrant breach of a trust obligation imposed upon the promoters to those whom they induced to invest in the corporation. See Annotation, 85 A.L.R. at page 1276.

We hold that the technical assent of the corporation through its promoters to the deceptive transaction is no defense to an action by the corporation when freed of its bonds. We think the complaint stated a claim upon which relief can be granted. The judgment is reversed.

PHILLIPS, Circuit Judge (dissenting).

Prior to the organization of the San Juan Uranium Corporation,[1] one Rollie B. Walter learned that a certain mining lease covering lands near Durango, Colorado, could be obtained from the owners thereof, without consideration other than an agreement to explore and develop the claims and to pay the owners certain royalties.

Walter, B. C. Deardorf and Thomas G. Wolfe entered into an agreement whereby Walter would obtain the lease; that a corporation would be formed to take title to the lease and that Walter would receive 100,000 shares of the common capital stock of the corporation upon its formation as consideration for his services in obtaining the lease and other services to be performed for the corporation.

The lease was "procured" by Walter, but taken in the name of William Smallwood, a fourth party who had no apparent interest in the transaction.

The San Juan Uranium Corporation was then organized, receiving its charter on March 15, 1954.

On or about March 17, 1954, Smallwood assigned the lease to San Juan and received San Juan's promissory note of that date for $25,000, due September 17, 1954, and 300,000 shares of stock in San Juan.

San Juan then offered its stock to the public under an exemption from registra-

1. Hereinafter called San Juan.

tion of the Securities Exchange Commission, under an offering circular dated April 9, 1954, as amended to June 7, 1954.

On November 1, 1954, out of its proceeds of the sale of its common stock, San Juan issued its check to William Smallwood in the amount of $25,000. This check was delivered to Thomas G. Wolfe and when cashed by him it bore the endorsements of Smallwood and Wolfe.

On July 19, 1955, the SEC issued an order temporarily suspending the exemption for non-compliance with Regulation A of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77aa, listing numerous instances of "failure to disclose" certain facts, which, *inter alia*, were vital to the continuance of the exemption in the absence of satisfactory explanation.

In the instant case San Juan seeks to establish an equitable lien on certain property purchased by Wolfe with the proceeds of the $25,000 check.

The theory of San Juan's case is that the promoters of San Juan, Wolfe and Deardorf, perpetrated an actionable fraud on San Juan by obtaining "secret profits" in violation of their fiduciary relationship to San Juan, since there were subsequent stockholders who obtained stock from San Juan after the lease was taken by Smallwood and assigned to San Juan. It predicates its claim of fraud on the alleged fact that the promoters failed to disclose to such subsequent stockholders that the promoters caused San Juan to pay a "dummy" (Smallwood) the $25,000 for valueless mining leases, which San Juan, in fact, owned, through the agreement to give Walter 100,000 shares of common capital stock for services in acquiring the lease.

In the Offering Circular published and distributed by San Juan, the following information was stated:

"* * * The Corporation has acquired by assignment from William M. Smallwood and wife Dettie Smallwood, of Oklahoma City, Oklahoma, a lease on the mining properties * * *. Consideration for this lease assignment is $25,000.00 in cash and 300,000 shares of the Corporation's common stock. The $25,000.00 cash is to be paid six (6) months after the execution date of the assignment.

* * * * * *

"300,000 shares of the common stock have been issued to William M. Smallwood * * *, as part of the consideration for the *acquisition* of the mining lease and option owned by the Corporation. (Emphasis supplied.)

* * * * * *

"For promotional services rendered in connection with the acquisition of the properties for the Corporation and the formation of the Corporation, shares of common stock have been issued to the following:

Rollie B. Walter .......... 100,000
James B. Kenney .......... 100,000
P. Ray Schwoerke ........ 100,000
                         ─────────
                           300,000

"* * * William M. Smallwood, from whom the Company acquired the lease on the mining claims, will own approximately 25.02% or 300,000 shares, for which he will have paid no cash consideration; * * *

* * * * * *

"The Company intends to carry on a preliminary exploratory program to establish the extent and *possible value* of uranium and vanadium ore located on the above leased mining claims. (Emphasis supplied.)

"It is anticipated that the first stage of the operation on this property will provide for core drilling primarily *to determine whether a commercially minable body of ore exists* and if so, to determine the extent. * * * * (Emphasis supplied.)

"It is estimated the above core drilling * * * will cost approximately $75,000.00. If a commercially minable body of ore is found to exist, mining and selling * * * will result.

    ..    *    *    *    *

"*In the event the results of the exploratory program outlined above are unsatisfactory* for mining the ore commercially from these mining claims, the company will then acquire other mining properties for the purpose of exploration to determine their value for commercial mining purposes." (Emphasis supplied.)

"During the period of World War II, the Vanadium Corporation of America had an operating lease on the above list of mining claims and mined and shipped ore to their mill in Durango. * * *.

"Since the end of World War II, the Vanadium Corporation of America has returned the lease to the claim owners as the Company does not maintain mining organization in this area * * *."

At the time of the assignment of the lease by Smallwood to San Juan and the issuance of the promissory note to Smallwood as consideration therefor, no cause of action came into being in the corporation, since all of the then directors and all of the then stockholders had full and complete knowledge of the facts and assented to the transaction.[2]

I do not think that under such circumstances a cause of action thereafter came into being on behalf of San Juan by reason of the fact that subsequent stock-holders purchased stock in the corporation without a full disclosure to them of the facts with respect to the Smallwood transaction.

If there was a fraud perpetrated on the subsequent stockholders, which fact I doubt, because of the disclosure in the offering circular that the lease was wholly undeveloped and unproven and, at most, had a purely speculative value, while it may have given rise to a personal cause of action, respectively, in the stockholders,[3] it did not bring into existence a cause of action in the corporation which had not theretofore existed.

I am not willing to overrule our decision in the Arn v. Dunnett case, 93 F.2d 634, which involved Oklahoma transactions, controlled by Oklahoma law, nor reject the principles laid down in Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 52 L.Ed. 1025. I think those cases represent the better reason and logic in this facet of corporation law than do the cases relied on in the majority opinion. Neither do I find any substantial difference in the facts in the Arn and Old Dominion Copper Company cases and the instant case, nor any real basis for distinguishing the instant case from those cases.

McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121, is distinguishable from the Old Dominion Copper Company case on the facts, as the opinion of the majority in the McCandless case clearly indicated. In the McCandless case there was a violation of a state statute, not present in the Old Dominion case, nor in the instant case.

For the reasons indicated, I would affirm.

2. Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U.S. 206, 212, 28 S. Ct. 634, 52 L.Ed. 1025; Arn v. Dunnett, 10 Cir., 93 F.2d 634, 637; Arn v. Operators Royalty & Producing Co., D.C. N.D.Okl., 13 F.Supp. 769, 772; South

Penn Collieries Co. v. Sproul, 3 Cir., 52 F.2d 557; Ball v. Breed, Elliott & Harrison, 2 Cir., 294 F. 227.

3. See in this regard: Manning v. Berdan, C.C., 135 F. 159.